**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

SHERINA FLORENCE,

                **Plaintiff,**

      **v.**

**72ANDSUNNY PARTNERS, LLC and**
**STAGWELL, INC.,**

                **Defendants.**

-------------------------------------------------------------x

**COMPLAINT**

**Case No.**

**DEMAND FOR JURY TRIAL**

Plaintiff Sherina Florence, by her attorneys Giskan Solotaroff & Anderson LLP and Outten & Golden LLP, for her complaint against Defendants 72andSunny Partners, LLC and Stagwell, Inc., alleges as follows:

## PRELIMINARY STATEMENT

1.      This is a tragic case of sexual harassment, unthinkable sexual assault, and retaliation.

2.      Ms. Florence, a Black woman with extensive experience as an advertising and creative executive, joined the advertising agency 72andSunny Partners, LLC (an affiliate of Stagwell, Inc.) at the height of her career.  Ms. Florence worked tirelessly on behalf of the Company, bringing in lucrative business and raising the Company's profile.  She left broken, traumatized, and jobless—a shell of the person she once was.

3.      While employed, Ms. Florence was asked to partner with a start-up advertising agency (the "Start-Up").  Ms. Florence's interactions with personnel from the Start-Up took a dark turn after she was robbed, drugged, and sexually assaulted in her home.  Ms. Florence reasonably believes that executives from the Start-Up were responsible.

1

4.      When Ms. Florence complained to senior leadership within 72andSunny—including its CEO, Human Resources, and her supervisor—about the incident and her reasonable belief that their business partners had perpetrated the horrible acts against her, nothing was done. Ms. Florence raised the same complaints to additional senior leaders—including 72S's Chief Marketing Officer and its Head of DEI—after taking FLMA leave; still, nothing was done to remedy the situation.

5.      Instead, Ms. Florence was met with textbook retaliation: her accounts were taken away and given to less qualified male colleagues; her direct reports were removed; she was excluded from meetings; her work wasn't acknowledged; she was labeled "difficult"; and eventually her employment was terminated.

6.      Ms. Florence was, and still is, deeply traumatized by the sexual assault and by Defendants' cruel and casual reaction to it.

7.      In addition to being outrageous and unethical, Defendants' actions violated numerous state and federal laws.  Ms. Florence brings this action alleging violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2611 *et seq.*; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; the New State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq.;* the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 *et seq.*; and N.Y. Labor Law ("NYLL") § 215.

## PARTIES

8.      Plaintiff Sherina Florence is a 46-year-old woman who currently resides in Texas and the United Kingdom.

9.      Defendant 72andSunny Partners, LLC ("72S") is a limited liability company duly organized under the laws of the State of Delaware with its principal place of business at 12101

2

W. Bluff Creek Drive, Playa Vista, California 90094.  72S is a global creative advertising company that employs over 500 people and has offices around the world, including in New York at 30 Cooper Square, 10th Floor, New York, NY.  72S is a corporate affiliate of Stagwell, Inc.

10.     Defendant Stagwell, Inc. ("Stagwell"), is a publicly traded corporation (NASDAQ: STGW) incorporated in Delaware with its principal place of business at One World Trade Center, Floor 65, New York, NY.  According to Stagwell's annual report, its annual revenue in 2024 was $2.3 billion.  Stagwell has oversight and control over 72S's operations and finances, including, for example, serving as the administrator of the 401k plan for all employees.

11.     At all relevant times herein, Ms. Florence met the legal definition of an "employee" of Defendants 72S and Stagwell.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the claims made pursuant to the FMLA and Title VII pursuant to 28 U.S.C. § 1331.

13.     This Court has supplemental jurisdiction over the NYSHRL, NYCHRL, and NYLL claims pursuant to 28 U.S. Code § 1367(a) as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

14.     On May 8, 2024, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") against Defendants for discrimination (based on race, color, and sex) and retaliation.

15.     Plaintiff received a Notice of Right to Sue ("NORTS") from the EEOC on May 28, 2025.  This lawsuit is being filed within 90 days of receipt of the NORTS, as required under 29 U.S.C. § 626(e).

16.     This Court has personal jurisdiction over Defendants because Defendants conduct business in the State of New York and in this District, maintain corporate offices in Manhattan, which is in this District, and employ numerous employees in the State of New York.

17.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendants conduct business in this District.

## THE FACTS

**A. Mr. Florence's Background.**

18.     Ms. Florence is a highly accomplished advertising and creative executive.

19.     When Ms. Florence began working for 72S in 2020, she was at the top of her field, with limitless career possibilities in front of her.  Ms. Florence had a solid book of lucrative business and was heavily sought after by clients and advertising agencies.

20.     After earning her BFA in Art and Art History, Ms. Florence cultivated a 15-plus-year career as a creative change agent intensely focused on connecting people through innovative ideas and experiences.

21.     Ms. Florence has been an Art Director, Designer, Director of Branded Content, a Creative Director and a Group Creative Director for global brands producing cutting-edge content, strategy, and solutions that impact both her clients and culture.  Prior to being hired by 72S, Ms. Florence held leadership roles at Ogilvy and Beats by Dre.

22.     Ms. Florence's work has garnered numerous awards, including recognitions by *Rolling Stone*, *Time Magazine*, *Creativity*, and The One Show.

23.     In addition, Ms. Florence has been invited to sit on several prestigious boards, including One ID, The One Club for Creativity, Poster House Museum, and The Creative Circus, a prestigious advertising school from which she graduated.  For many of these positions, Ms.

Florence was the youngest member and often the first and only Black woman—praiseworthy accomplishments as the creative advertising and marketing industry is dominated by white men.

**B. 72andSunny's Relationship with the Start-Up.**

24.     In 2019, 72S announced and widely advertised its formal partnership with a diverse start-up run by Black men with very little experience working within the advertising industry (referred to herein as the "Start-Up").

25.     72S created internal documents detailing the scope of the business relationship. Specifically, 72S was responsible for developing the Start-Up's position within the industry, creating its visual identity as an agency, building its business model, leading its public relations launch and industry outreach, creating the Start-Up's launch materials, introducing executives from the Start-Up to 72S's clients, and providing ongoing coaching and support.  72S has invited the Start-Up's leadership into its network, introduced them to key stakeholders in the industry, and vouched for them as professionals doing quality work.

26.     The business partnership between 72S and the Start-Up has been in place since 2019 and continues to this day.

**C. Ms. Florence's Successful Start at 72S.**

27.     In the Fall of 2020, 72S's co-founder, Glenn Cole, recruited Ms. Florence to serve as Group Creative Director based out of its New York offices.

28.     Mr. Cole introduced Ms. Florence to 72S's leadership.  Ms. Florence learned about leadership's vision for her role and key partnerships they wanted her to develop, including one with the Start-Up.

29.     During the course of her recruitment, Ms. Florence noticed a dearth of Black employees within 72S.  Ms. Florence was told that a number of Black employees had recently

left.  Tim Jones, 72S's then-Head of Strategy, and Carlo Cavallone, 72S's Chief Creative Officer, assured Ms. Florence that 72S was a "champion of diversity" and that they were dedicated to "diversifying the creative class."  Messrs. Jones and Cavallone further expressed their hope that Ms. Florence would help 72S improve diversity in the office.

30.    When Ms. Florence joined 72S in November 2020, she was the highest-ranking woman of color, overseeing a team of about eight direct reports, two of whom she recruited and hired.

31.    Within weeks of Ms. Florence's start date, she began working on two important pieces of business: (1) a Comcast campaign for the upcoming Olympics; and (2) a campaign for Smirnoff RWB.  She also brought in new campaign opportunities, such as Instagram Global.

32.    Meanwhile, 72S capitalized on Ms. Florence's outstanding reputation by touting her onboarding in press releases.

33.    However, as the only woman of color at her level, Ms. Florence was immediately met with challenges: 72S quickly tried to box her in and assign her to accounts led by non-white clients so that she could improve the Company's image and relationships.

34.    Although Ms. Florence was able to stabilize the relationships between the Company and its non-white clients, it meant she had a front row seat to what had strained the relationships in the first place: a general lack of respect from 72S leadership for the non-white clients, including white producers (hired by 72S) berating and belittling non-white clients on set.

35.    Nonetheless, Ms. Florence navigated the white, male-dominated landscape and positioned herself and the Company for success.

**D.  Ms. Florence is Assigned to Manage the Difficult Relationship with the Start-Up.**

36.     Ms. Florence was told that part of her role would include working with the Start-Up and supporting the partnership 72S was developing.  Mr. Jones described the Start-Up as a very rough young company that would need help developing its ideas and building its relationships.  Over the next few months, Ms. Florence worked alongside Mr. Jones to build a good rapport with the Start-Up's founders.

37.     In the Spring of 2021, Mr. Jones announced he was leaving 72S that summer and began transitioning the management of the Start-Up to Ms. Florence.

38.     Ms. Florence became the Start-Up's sole point of contact in 72S's New York office.

39.     One of the Start-Up's founders began making inappropriate comments to Ms. Florence, frequently telling her how he admired her, demanding she hug him and constantly texting her.  By May 2021, he declared his love for Ms. Florence, which she rebuffed.

40.     Despite the litany of challenges associated with working with the Start-Up, Ms. Florence was initially successful in maintaining a professional relationship by ensuring interactions were limited to text, rather than in person.

41.     However, the situation spiraled in June 2022, when Ms. Florence attended the Cannes Lions International Festival of Creativity ("Cannes") in France.

42.     Several executives from the Start-Up were also in attendance.

43.     Each time Ms. Florence saw the Start-Up's executives at Cannes, they were inappropriate and unprofessional.  For example, Ms. Florence witnessed them excessively drinking and shouting at people attending the festival.  One of them even tried to gain access to

an area of Ms. Florence's hotel restricted to hotel guests and caused a scene when security blocked him.

**E.  The Start-Up Escalates its Harassment of Ms. Florence, Showing Up at Her Home, Uninvited, and Threatening to Hurt Her.**

44.    Following Cannes, the Start-Up's founders became increasingly predatory, constantly texting Ms. Florence, trying to schedule meetings with her, and profusely sharing how much "fun" they had at Cannes.

45.    On July 24, 2022, Ms. Florence hosted a networking brunch at the community space in her apartment building in New York City.  Attendees included a number of prominent Black creatives from a range of industries.  It was not uncommon for Ms. Florence to host these types of networking events.  Executives from 72S had attended past events hosted by Ms. Florence.  These events were a testament to Ms. Florence's reputation in the creative industry and her vision.

46.    The morning of the event, the founders of the Start-Up began contacting Ms. Florence, asking her to get together with them that day.  Ms. Florence said she was not available because she was hosting a networking brunch.

47.    The Start-Up founders refused to take "no" for an answer.  They continued to ask Ms. Florence to spend time with them.  Given Ms. Florence was hosting a networking event, she begrudgingly told the founders they could "stop by" her brunch, and that she would introduce them to some of her industry contacts.  Ms. Florence felt obligated to extend this courtesy invitation to protect 72S's partnership with the Start-Up, which she knew 72S valued.

48.    The Start-Up's founders arrived at Ms. Florence's residence more than an hour before the networking brunch was set to begin.

49.     They immediately started to make Ms. Florence feel uncomfortable in her own home.  For example, rather than waiting for the other guests to arrive in the community space where the brunch was being hosted, they insisted on staying in her apartment while she was getting ready.  One of them spent an unusually long amount of time in her bathroom.  Another took his shirt off and began pacing around, brandishing his gang tattoos.

50.     Ms. Florence told them to stop their inappropriate conduct and to regain control of their behavior, mentioning that some of their behavior in Cannes was also inappropriate.

51.     Then, one of them became hostile and threatened her:

> *You're lucky.  If I didn't love you, I'd have someone come to your house, fuck you in your bed, cum all over your sheets. You wouldn't even know what happened. And I'd do it just because I could. I'd even wait long enough for you to forget I said it.*

52.     Ms. Florence was terrified.

53.     Ms. Florence recalls the words because the speaker stared into her face as he said them.  The delivery of the words seemed to Mr. Florence to have been rehearsed.  It was a very strange and scary situation for Ms. Florence.

54.     Ms. Florence's invited guests began to arrive soon thereafter.

55.     The Start-Up's founders continued to behave inappropriately throughout the brunch, professing their feelings for Ms. Florence and drinking excessively.

56.     They probed Ms. Florence for personal information, peppering her with questions about her family and personal matters.  They also repeatedly left the community space and went, uninvited, into her residence, despite the fact that Ms. Florence was clearly hosting the event on her building's rooftop community space, not in her apartment.

57.     In Ms. Florence's home, the founders spent excessive amounts of time in the bathroom and even searched through her bedroom drawers.  She later realized that items were missing, such as perfume items from her underwear drawer.

58.     Over the next few weeks, Ms. Florence attempted to distance herself from the Start-Up.

59.     However, one of the Start-Up's founders continued to taunt Ms. Florence, sending her mysterious and vaguely threatening messages, including gang-related images.  Ms. Florence felt afraid and confused.

**F.  Ms. Florence is Drugged, Robbed, and Raped.**

60.     Then, horrifically, only six weeks later, Ms. Florence was drugged, robbed, and sexually assaulted in her home in early September 2022, specifically on the night of September 5 until the morning of September 6.

61.     Ms. Florence's recollection from that night is extremely hazy because she was drugged without her consent or knowledge.

62.     However, the memories she has recovered paint a very graphic and disturbing picture.

63.     Ms. Florence recalls involuntarily passing out on her bed on September 5, fully clothed.  She woke up intermittently throughout the night in her bed, in the midst of being sexually assaulted.

64.     Ms. Florence recalls seeing two executives from the Start-Up in her bedroom and bathroom, but feeling too weak and disoriented to stop them.

65.     When she regained full consciousness on September 6, she started to put the pieces together.  She noticed that certain treasured personal items were gone.

66.    Based on the prior threats, the taunting messages, and her visual memories, it is Ms. Florence's reasonable belief that she was drugged, sexually assaulted, and robbed by individuals affiliated with the Start-Up.

67.    To say that Ms. Florence was traumatized is an understatement.

68.    Ms. Florence called 911 numerous times.  She filed a police report and spoke at length with officers and detectives from the New York Police Department ("NYPD").

69.    Ms. Florence also worked with her landlord and property manager to change the locks on her doors and obtain security footage.

70.    Despite taking these steps, Ms. Florence never felt safe in her apartment again.

71.    Moreover, after hearing Ms. Florence's story, a detective from the NYPD's Special Victim Unit advised her to leave her apartment for her own safety.

72.    Ms. Florence moved out soon thereafter.

73.    The trauma of the events of September 5-6, 2022 still haunt her to this day.  Ms. Florence has undergone extensive medical treatment, including therapy and psychiatry, which are helping her address the severe emotional turmoil she experienced.

**G. Ms. Florence Reports the Harassment, Robbery, and Assault to 72S Executives, who Minimize and Ignore the Complaints.**

74.    On September 29, 2022, with the trauma still raw, Ms. Florence got the courage to disclose to Melissa Morahan, 72S's Head of Human Resources New York, that she reasonably believed senior leadership from the Start-Up were involved in a series of crimes against her, specifically the robbery and sexual assault that took place in her home.

75.    Despite Ms. Florence's directive to not disclose her sexual assault to Company leadership, Ms. Morahan did just that: she disclosed Ms. Florence's allegations to Mr. Cavallone.

76.    From this point forward, Ms. Florence's employment trajectory spiraled down.

77.    Ms. Florence disclosed to multiple people within 72S that she reasonably believed

executives from the Start-Up had harassed, drugged, robbed, and assaulted her.

78.    Over the course of four months, Ms. Florence made the following complaints:

• On September 30, 2022, Ms. Florence disclosed the sexual assault, robbery, and ongoing harassment, which she reasonably believed had been perpetrated by executives from the Start-Up, to Mr. Cavallone.  At first Mr. Cavallone expressed concern and was quite supportive.  Mr. Cavallone agreed with Ms. Florence about potential solutions: cut all contact with the Start-Up and get Ms. Florence the support and resources she needed to address the trauma.  Unfortunately, Mr. Cavallone's solutions never came to fruition.  In fact, mere days after she disclosed the traumatic events to Mr. Cavallone, he attempted to schedule Ms. Florence's first performance review.  Ms. Florence was shocked at this callousness.  She shared that this was not the appropriate time for any kind of performance review and tried to refocus the conversation on the partnership with the Start-Up as its executives continued to taunt and target her.

• In mid-October 2022, Ms. Florence attempted to disclose the sexual assault, robbery, and ongoing harassment, which she reasonably believed had been perpetrated by executives from the Start-Up, to Glenn Cole, 72S's co-founder.  Ms. Florence told him that she needed support navigating the situation because, even though she had spoken with HR and her supervisor, no actions had been taken to address the issue.  In response, Mr. Cole completely shut down the conversation.  He would not allow Ms. Florence to tell him any details, including who had harmed her.  Mr. Cole told Ms. Florence that he could not discuss these issues anymore and that he would be cancelling her 1:1 meetings with him going forward.

• On October 17, 2022, Ms. Florence disclosed the sexual assault, robbery, and ongoing harassment, which she reasonably believed had been perpetrated by executives from the Start-Up, to Emily Venizelos, Global Head of Human Resources.  Ms. Florence stated that, but for her role at 72S, she would not have been placed in this situation, and that she feared for her safety because 72S's collaboration with the Start-Up was ongoing.  In response, Ms. Venizelos seemed shocked at Mr. Cavallone's response and stated she would escalate the issue to 72S's President, Evin Shutt.

• On November 2, 2022, Ms. Florence emailed Ms. Shutt stating, "Please note, I've been trying to get proper support on this for over a month now. And I have been seeking clarity and resources. It would be great if the agency could prioritize creating a safe space for me to deliver my best. This should have been the first thing that was discussed when I reported the assault in my home."  The Company ignored the obvious solution—to expeditiously sever ties with the Start-Up—and instead, Ms. Shutt made hollow promises to do what she could.  Although the Company granted Ms. Florence's request to take two weeks of paid time off ("PTO"), it also did exactly

what Ms. Florence feared: 72S continued to work with the alleged assailants and sent other Black female employees to attend events with the Start-Up, including the November 2022 AdColor Awards, which Ms. Florence reasonably feared could be placing 72S employees in danger.

- On December 3, 2022, Ms. Florence again emailed Ms. Venizelos, reporting that the Start-Up founders were harassing her via phone. Again, 72S ignored Ms. Florence's request to sever the relationship and instead granted Ms. Florence additional PTO to begin therapy and find a new home.

- In December 2022, Ms. Florence attempted to speak with Mr. Cole again. Mr. Cole once again refused to let Ms. Florence tell him the full story and yelled at her.

79.     Ms. Florence specifically asked Ms. Shutt to escalate the situation internally with Stagwell because the relationship with the Start-Up was woven through all of the businesses, which created a danger for Ms. Florence and others.

80.     Ms. Venizelos promised Ms. Florence that Ms. Shutt was escalating the matter and was speaking with the appropriate people at Stagwell.

81.     Stagwell was thus made aware of Ms. Florence's complaints regarding her reasonable belief and fear that the Start-Up played a role in her harassment, drugging, robbery, and sexual assault.

82.     Ms. Florence took two weeks of PTO. However, the length of time was insufficient given the circumstances. In January 2023, Ms. Florence took protected medical leave under the Family Medical Leave Act ("FMLA").

83.     Shockingly, despite Ms. Florence's complaints and pleas for help, the Company did nothing to address her serious concerns.

**H.  72S Retaliates Against Ms. Florence, Culminating in Her Termination.**

84.    When Ms. Florence returned from medical leave in March 2023, she hoped that it would be the start of a new chapter.  Instead, she was faced with an expertly choreographed campaign of retaliation.

85.    Prior to medical leave, Ms. Florence managed several high-profile accounts, including 1800 Tequila and Smirnoff, as well as accounts that she brought to the Company like Footlocker and Sonos.  She also managed eight direct reports.

86.    Ms. Florence returned from FMLA leave to a position that was *vastly* different from the position she had previously held.

87.    First, 72S removed all of Ms. Florence's direct reports, a blow to her standing in the organization, her growth potential, and her self-esteem.

88.    Second, 72S stripped away Ms. Florence's key accounts, giving them to her less qualified male subordinates.  72S staffed Ms. Florence as the "cultural" advisor on the accounts, thus forcing her to serve in a supporting role to the less qualified men who had replaced her.

89.    Third, 72S began cancelling meetings with Ms. Florence and excluding her from the Company's leadership meetings.  Mr. Cavallone began presenting ad campaigns Ms. Florence had conceptualized and built, pitching her ideas, and listing her last on publications despite her significant contributions to the work.

90.    By May 2023, Ms. Florence had been frozen out of her accounts and substantial amounts of work had been taken away from her.

91.    Furthermore, upon Ms. Florence's return from medical leave, Mr. Cavallone presented her with feedback from the performance review he had initiated in September 2022,

just days after the robbery and assault.  This feedback was obviously part of the bigger plan to push Ms. Florence out of the Company.

92.     While on leave, Ms. Florence had indicated individuals on her team who would be appropriate to evaluate her performance.  These individuals were not solicited to provide any feedback.  Instead, Mr. Cavallone presented her with criticism from two junior creatives whom Ms. Florence had raised complaints about previously.

93.     When Ms. Florence challenged the feedback, drawing the connection, Mr. Cavallone backtracked and said this was just some initial information and they would regroup to discuss the full performance review soon.  They never discussed it again.

94.     Nonetheless, Ms. Florence found ways to add value to the Company by teaching courses and finding speaking engagements at high-profile events.

95.     In mid-June 2023, Ms. Florence attended Stagwell's week-long Sport Beach conference,[1] a prestigious event held at the Cannes Lions Festival.  Mr. Cavallone specifically told Ms. Florence to attend the event in Cannes, and the expectation was that she would attend the Sport Beach conference while there.  Ms. Florence thus attended in support of 72S.

96.     To Ms. Florence's shock, executives from the Start-Up also attended this event.  When Ms. Florence saw them, she panicked.  Ms. Florence quickly approached Ms. Shutt, pulled her aside, and confronted her about the situation.  Ms. Shutt blamed Ms. Florence, telling her it was her own fault.  Disgusted, Ms. Florence left.

97.     That same day, June 19, 2023, Ms. Florence complained again, this time to Damaune Journey, 72S's Chief Marketing Officer.  She told Mr. Journey about the sexual

---

[1] Sport Beach is a marketing event in which Stagwell partners with brands and famous athletes to deliver business strategy and other types of workshops.

assault, robbery, and harassment, which she reasonably believed the Start-Up was responsible

for. Ms. Florence told Mr. Journey that she simply wanted to feel safe while doing her job.

98.    Mr. Journey was conciliatory and expressed some prior knowledge of the

situation, but provided no solutions. The Company continued to ignore Ms. Florence's

complaints and allowed the Start-Up's founders to attend the high-profile weeklong festival run

by Stagwell.

99.    On June 21, 2023, Ms. Florence appealed to Mr. Cavallone again, directly asking

him why 72S continued to partner with the Start-Up when the Company knew she filed a

complaint against the founders.

100.    In response, Mr. Cavallone was bold enough to state that the Company had

generated too many public ties to the Start-Up that they could not jeopardize the partnership and

72S's reputation by extension.

101.    72S thus knowingly prioritized and continued to partner with individuals who had

been credibly accused of harming the Company's highest ranking Black female employee.

102.    During this meeting, Mr. Cavallone continued the Company's gaslighting routine

of professing support for Ms. Florence without any action. Mr. Cavallone also discussed Ms.

Florence's future at the Company, specifically that he wanted her to build a new team to support

1800 Tequila and to get the business back on track.

103.    Despite Mr. Cavallone's promises, Ms. Florence never regained ownership of the

1800 Tequila account. The Company continued to isolate her, keeping her out of meetings and

sidelining her work.

104.    On June 23, 2023, Ms. Florence complained about the sexual assault, robbery,

and harassment that she reasonably believed was perpetrated by the Start-Up to Brittney Allen,

72S's Head of Diversity, Equity and Inclusion, stating that she continued to feel unsafe in her job because of how the Company had ignored her reports and continued to partner with the Start-Up. Ms. Allen stated that she would work to support Ms. Florence.

105.    On July 13, 2023, Ms. Florence sent a final plea to Ms. Shutt and Ms. Venizelos, telling them it was "highly concerning" that the "the men you know threatened and harmed me were in attendance" at Stagwell's Sport Beach and "you haven't done anything to wind down the relationship."

106.    Ms. Florence further stated: "I have not been properly reintegrated into any work flow since medical leave. And feel that I am being discriminated against. All of my direct reports were taken, I have no business to work and when I'm doing my best to create new opportunities for business to work on in Cannes, I've been retraumatized."

107.    That same day, July 13, 2023, 72S terminated Ms. Florence's employment due to "financial hardships" but commended her performance and contributions.

108.    To the extent 72S argues that Ms. Florence's role was obsolete, it is by its own design: upon her return from medical leave, 72S stripped Ms. Florence of her accounts and direct reports, giving them all to men, and then manufactured negative feedback from junior creatives she had previously complained about.

109.    72S claims it removed Ms. Florence's title from their operations; however, a white man currently holds the role Group Creative Director at 72S's New York office.  This, coupled with the fact that Mr. Cavallone discussed Ms. Florence building a new team a mere month before eliminating her role, is another example of the Company's pretextual and retaliatory conduct.

**I.    72S's Pattern of Mistreating of People of Color.**

110.    72S has engaged in a pattern of discriminating against Black employees and Black women.

111.    The Company's treatment of Ms. Florence, as a Black woman, was consistent with a larger pattern of race discrimination at 72S.

112.    Over the years, many highly talented and competent Black employees were pushed out, under-leveled, under-paid, harassed, and subjected to other forms of race discrimination.

113.    Ms. Florence witnessed white employees mistreat Black employees at 72S.  For example, one Black employee at 72S was belittled by his colleagues in public, thus publicly humiliating him.  Another Black employee was berated in front of a group of people and told, "you can't do this job" and "I don't even have time to give you feedback, I don't know what the point is."  White employees at 72S were not mistreated this way.

114.    Ms. Florence also saw that 72S permitted white producers to berate and abuse Black clients during shoots.

115.    The racially discriminatory environment was so egregious that two months prior to her joining the Company, over 100 employees signed an almost 200-page report, detailing instances of racial bias, stereotyping and discrimination targeting Black employees at 72S.

116.    This 200-page report was not disclosed to Ms. Florence during the recruitment process.  In fact, when she asked about the Company's lack of diversity, she was assured there were no race issues within the organization.

117.    In short, Defendants have engaged in a yearslong pattern of hiring successful Black talent, particularly women, and retaliating against them in the form of poor performance

reviews and forced separations after they raised complaints regarding race and gender discrimination.

118.    As a result of Defendant's actions, Ms. Florence has suffered significant economic damages in lost wages, benefits, and other compensation; extreme emotional distress, as a result of the assault and compounded by 72S's grossly inadequate response to Ms. Florence's complaints about the assault, including her termination; liquidated damages; and attorneys' fees and costs.

## FIRST CLAIM FOR RELIEF

### Retaliation in Violation of the FMLA

119.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

120.    Defendants terminated Plaintiff in retaliation for taking medical leave to which she was entitled pursuant to the FMLA, in violation of the FMLA, 29 U.S.C. § 2615(a)(1).

121.    As a result of Defendants' retaliation, Plaintiff has suffered and continues to suffer damages.

## SECOND CLAIM FOR RELIEF

### Discrimination on the Basis of Sex Violation of Title VII

122.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

123.    Defendants discriminated against Plaintiff on account of her sex/gender in the terms and conditions of her employment in violation of Title VII.

124.    As a result of Defendants' discrimination, Plaintiff has suffered and continues to suffer damages.

## THIRD CLAIM FOR RELIEF

### Discrimination on the Basis of Race in Violation of Title VII

125.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

126.    Defendants discriminated against Plaintiff on account of her race/color in the terms and conditions of her employment in violation of Title VII.

127.    As a result of Defendants' discrimination, Plaintiff has suffered and continues to suffer damages.

## FOURTH CLAIM FOR RELIEF

### Discrimination on the Basis of Sex Violation of the NYSHRL

128.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

129.    Defendants discriminated against Plaintiff on account of her sex/gender in the terms and conditions of her employment in violation of the NYSHRL.

130.    As a result of Defendants' discrimination, Plaintiff has suffered and continues to suffer damages.

## FIFTH CLAIM FOR RELIEF

### Discrimination on the Basis of Race in Violation of the NYSHRL

131.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

132.    Defendants discriminated against Plaintiff on account of her race/color in the terms and conditions of her employment in violation of the NYSHRL.

133.    As a result of Defendants' discrimination, Plaintiff has suffered and continues to suffer damages.

## SIXTH CLAIM FOR RELIEF

### Discrimination on the Basis of Sex Violation of the NYCHRL

134.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

135.    Defendants discriminated against Plaintiff on account of her sex/gender in the terms and conditions of her employment in violation of the NYCHRL.

136.    As a result of Defendants' discrimination, Plaintiff has suffered and continues to suffer damages.

## SEVENTH CLAIM FOR RELIEF

### Discrimination on the Basis of Race in Violation of the NYCHRL

137.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

138.    Defendants discriminated against Plaintiff on account of her race/color in the terms and conditions of her employment in violation of Title VII.

139.    As a result of Defendants' discrimination, Plaintiff has suffered and continues to suffer damages.

## EIGHTH CLAIM FOR RELIEF

### Retaliation in Violation of Title VII

140.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

141.    Plaintiff engaged in protected activities under Title VII, including complaining that she believed she had been sexually harassed, drugged, sexually assaulted, and robbed by Defendants' business partners.

142.    Defendants were aware of Plaintiff's protected activities.

143.    Defendants violated Title VII by taking adverse actions against Plaintiff because of her protected activities, including by, inter alia, reassigning her accounts, taking away her direct reports, marginalizing and undermining her, excluding her, demeaning her to her team and leadership, and ultimately terminating her employment following her return from FMLA leave.

144.    Defendants' actions amount to willful or wanton negligence or recklessness and/or evidence a conscious disregard for Plaintiff's statutorily protected rights.

145.    As a result of Defendant's retaliation, Plaintiff has suffered and continues to suffer damages.

## NINTH CLAIM FOR RELIEF

### Retaliation in Violation of the NYSRHL

146.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

147.    Plaintiff engaged in protected activities under the NYSHRL, including complaining that she believed she had been sexually harassed, drugged, sexual assaulted, and robbed by Defendants' business partners.

148.    Defendants were aware of Plaintiff's protected activities.

149.    Defendants violated the NYSHRL by taking adverse actions against Plaintiff because of her protected activities, including by, inter alia, reassigning her accounts, taking away her direct reports, marginalizing and undermining her, excluding her, demeaning her to her team

and leadership, and ultimately terminating her employment following her return from FMLA leave.

150.    Defendants' actions amount to willful or wanton negligence or recklessness and/or evidence a conscious disregard for Plaintiff's statutorily protected rights.

151.    As a result of Defendants' retaliation, Plaintiff has suffered and continues to suffer damages.

## TENTH CLAIM FOR RELIEF

### Retaliation in Violation of the NYCHRL

152.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

153.    Plaintiff engaged in protected activities under the NYCHRL, including complaining that she believed she had been sexually harassed, drugged, sexually assaulted, and robbed by Defendants' business partners.

154.    Defendants were aware of Plaintiff's protected activities.

155.    Defendants violated the NYCHRL by taking adverse actions against Plaintiff because of her protected activities, including by, inter alia, reassigning her accounts, taking away her direct reports, marginalizing and undermining her, excluding her, demeaning her to her team and leadership, and ultimately terminating her employment following her return from FMLA leave.

156.    Defendants' actions amount to willful or wanton negligence or recklessness and/or evidence a conscious disregard for Plaintiff's statutorily protected rights.

157.    As a result of Defendant's retaliation, Plaintiff has suffered and continues to suffer damages.

## ELEVENTH CLAIM FOR RELIEF

### Retaliation in Violation of the NYLL

158.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

159.     Plaintiff's use of FMLA leave was a legally protected absence.

160.     Defendants retaliated against Plaintiff in the terms and conditions of her employment in violation of N.Y. Labor Law § 215 on account of Plaintiff using a legally protected absence.

161.     As a result of Defendant's retaliation, Plaintiff has suffered and continues to suffer damages.

## DEMAND FOR JURY TRIAL

162.     Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which they have a right to jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

(A)     Compensatory damages, including back pay and front pay;

(B)     Punitive damages in an amount to be determined by the trier of fact;

(C)     Extreme emotional distress damages;

(D)     Liquidated damages;

(E)     Reasonable attorneys' fees, disbursements, and costs;

(F)     Pre/post judgment interest; and

Such other and further relief as the Court may deem just and equitable.

Dated: August 26, 2025
      New York, NY

**GISKAN, SOLOTAROFF & ANDERSON LLP**

*/s/ Amy E. Robinson*

By:    Amy E. Robinson
1 Rockefeller Plaza, 8th Floor
New York, New York 10020
646-964-9609
arobinson@gslawny.com

- and -

*/s/ Tammy Marzigliano*
Tammy Marzigliano
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, New York 10017
(212) 245-1000
TM@outtengolden.com

*ATTORNEYS FOR PLAINTIFF*