USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 08/05/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHERINA FLORENCE,

Plaintiff,

-v-

72ANDSUNNY PARTNERS, LLC, et al.,

Defendants.

25-cv-7082 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendants 72andSunny Partners, LLC ("72andSunny") and Stagwell, Inc ("Stagwell" and with 72andSunny, "Defendants"), move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Amended Complaint ("AC") against them for failure to state a claim for relief. Dkt. No. 23.

**BACKGROUND**

Sherina Florence ("Florence" or "Plaintiff") is a Black woman with extensive experience as an advertising and creative executive. Dkt. No. 19 ("AC") ¶ 2. She began working for 72andSunny as Group Creative Director in November of 2020. *Id.* ¶¶ 22, 34, 40. Prior to working for 72andSunny, she held roles as Art Director, Designer, Director of Branded Content, Creative Director, and Group Creative Director for global brands, including leadership roles at Ogilvy and Beats by Dre. *Id.* ¶ 24. Her work has garnered numerous awards, including recognition by *Rolling Stone* and *Time Magazine*, among others, and she has been invited to sit on prestigious boards. *Id.* ¶¶ 25–26.

72andSunny is a global creative advertising company with offices around the world, including in New York City. *Id.* ¶ 9. It is a corporate affiliate of Stagwell, which refers to

72andSunny and other subsidiaries as part of its network. *Id.* ¶¶ 9, 11. Stagwell has oversight and control over 72andSunny's operations and finances, including serving as the administrator of the 401(k) and health plans for all employees. *Id.* ¶ 13.

Plaintiff was recruited to 72andSunny by Glenn Cole ("Cole"), a co-founder of the company. *Id.* ¶¶ 34–35. During her recruitment, Plaintiff asked 72andSunny about the dearth of Black employees within 72andSunny. *Id.* ¶ 36. She was told that a number of Black employees had recently left because they had been poached by other companies. *Id.* ¶ 37. Tim Jones ("Jones"), 72andSunny's Head of Strategy, and Carlo Cavallone ("Cavallone"), 72andSunny's Chief Creative Officer, assured Plaintiff that 72andSunny was a "champion of diversity" that was dedicated to "diversifying the creative class." *Id.* ¶ 39.

## I. Plaintiff's Work with the Start-Up

In 2019, 72andSunny announced a formal partnership with the Start-Up.[1] *Id.* ¶ 27. 72andSunny was responsible for developing the Start-Up's position within the industry, creating its visual identity, building its business model, leading its public relations launch and industry outreach, creating the launch materials, introducing Start-Up's executives to clients, and providing ongoing coaching and support. *Id.* ¶ 28. While he was serving as Head of Strategy at 72andSunny, Jones also held a leadership position at the Start-Up and sat on its advisory board. *Id.* ¶ 29.

Plaintiff was assigned to work with the Start-Up and support the partnership between the Start-Up and 72andSunny. *Id.* ¶ 46. Plaintiff worked with Jones to build a good rapport with the Start-Up's founders. *Id.* ¶ 47. In the spring of 2021, Jones announced that he was leaving 72andSunny and worked with Plaintiff to transition management of the partnership to Plaintiff.

[1] Plaintiff uses the anonymized name "Start-Up" in her complaint.

*Id.* ¶ 48. She became the Start-Up's sole point of contact in 72andSunny's New York office. *Id.* ¶ 49.

Around this time, one of the founders of the Start-Up began making inappropriate comments to Plaintiff, including telling her how he admired her, demanding that she hug him, and constantly texting her. *Id.* ¶ 51. In May 2021, he declared his love for Plaintiff which she rebuffed. *Id*. Despite these comments, Plaintiff was initially successful in maintaining a professional relationship by ensuring interactions were limited to text, rather than in-person. *Id.* ¶ 52.

In June 2022, Plaintiff attended the Cannes Lions International Festival of Creativity ("Cannes"). *Id.* ¶ 53. Several executives from the Start-Up were also in attendance, and 72andSunny expected Plaintiff to maintain a professional relationship with them. *Id.* ¶¶ 54–55. Each time Plaintiff saw the executives from the Start-Up at Cannes, they were inappropriate and unprofessional. *Id.* ¶ 56. She witnessed them excessively drinking and shouting at people. *Id.* One of the executives tried to gain access to Plaintiff's hotel after hours, when the premises were restricted to hotel guests, and caused a scene when security blocked him. *Id.* Plaintiff told Cole that she did not plan to attend an event at which the Start-Up's founders would be in attendance, but he responded that she was required to attend the event as a representative of 72andSunny. *Id.* ¶ 57. After Cannes, the Start-Up founders constantly texted Plaintiff, tried to schedule meetings with her, and profusely shared how much fun they had at Cannes. *Id.* ¶ 58.

On July 24, 2022, Plaintiff hosted a networking brunch at the community space in her apartment building. *Id.* ¶ 59. It was not uncommon for Plaintiff to host these types of networking events, and executives from 72andSunny had attended events hosted by Plaintiff in the past. *Id.* That morning, the Start-Up founders contacted Plaintiff and asked her to get

together with them. *Id.* ¶ 60. She informed them that she was not available because she was hosting a networking brunch. *Id.* As they continued asking her to spend time with them, she begrudgingly told them that they could "stop by" her brunch and she would introduce them to her industry contacts. *Id.* ¶ 61. She did so because 72andSunny "gave her the responsibility of increasing the Start-Up's profile in the advertising industry" and she "felt obligated to extend this courtesy invitation to protect [72andSunny's] partnership with the Start-Up, which she knew [72andSunny] valued." *Id.*

The Start-Up founders arrived more than an hour before the networking brunch was set to begin and, rather than waiting in the community space where the brunch was to be hosted, they insisted on staying in her apartment while she was getting ready. *Id.* ¶¶ 62–63. While in her apartment, one of them spent an unusually long time in her bathroom and another took his shirt off and began pacing around. *Id.* Plaintiff told them to stop their inappropriate behavior and mentioned that their behavior in Cannes was also inappropriate. *Id.* ¶ 64. In response, they stated, "You think you're the fucking queen of Cannes." *Id.* ¶ 65. She responded that she was surprised and reminded them of the support she had provided to the Start-Up, especially at Cannes. *Id.* ¶ 65. One of the founders then became hostile and threatened her:

> You're lucky. If I didn't love you, I'd have someone come to your house, fuck you in your bed, cum all over your sheets. You wouldn't even know what happened. And I'd do it just because I could. I'd even wait long enough for you to forget I said it.

*Id.* ¶ 67. Plaintiff was terrified and recalls that the speaker stared into her face as he threatened her. *Id.* ¶ 69.

Plaintiff's invited guests began to arrive soon thereafter. *Id.* ¶ 70. The Start-Up's founders continued to behave inappropriately throughout the brunch, professing their feelings for Plaintiff and drinking excessively. *Id.* ¶ 71. They peppered her with questions about her family

and personal matters and repeatedly left the brunch and went, uninvited, to her residence. *Id.* ¶ 72. Because of her work with the Start-Up, Plaintiff felt compelled to continue to host the founders and not ask them to leave. *Id.* ¶ 74. Plaintiff later discovered that several items were missing from her bedroom drawers, such as perfume and items from her underwear drawer. *Id.* ¶ 75.

Plaintiff attempted to distance herself from the Start-Up, but one of the founders continued to taunt her by sending her mysterious and vaguely threatening messages, including gang-related images. *Id.* ¶ 77. As the messages continued and grew more sinister, she felt afraid. *Id.*

Six weeks after the networking brunch, on September 5 through the morning of September 6, 2022, Plaintiff was drugged, robbed, and sexually assaulted in her apartment. *Id.* ¶ 78. Plaintiff's recollection is hazy because she was drugged, but she recalls involuntarily passing out on her bed on September 5, 2022 while fully clothed. *Id.* ¶¶ 79–80. She woke up intermittently throughout the night in the midst of being sexually assaulted. *Id.* ¶ 81. She recalls seeing two executives from the Start-Up in her bedroom and bathroom, but felt too weak and disoriented to stop them. *Id.* ¶ 82. She also recalls seeing an executive from the Start-Up taking objects from her home and later noticed that certain treasured personal items were gone. *Id.* ¶ 83. Based on the prior threats, the taunting messages, and her visual memories, Plaintiff believes that she was drugged, sexually assaulted, and robbed by individuals affiliated with the Start-Up. *Id.* ¶ 84.

After the incident, Plaintiff called 911 numerous times, filed a police report, and spoke at length with officers and detectives from the New York Police Department ("NYPD"). *Id.* ¶ 86. She also worked with her landlord and property manager to change the locks on her doors and

obtain security footage. *Id.* ¶ 87. Plaintiff still did not feel safe in her apartment and ultimately moved out a few months later. *Id.* ¶¶ 90, 96.

On September 29, 2022, Plaintiff reported to 72andSunny's Head of Human Resources ("HR") in New York, Melissa Morahan ("Morahan"), that she believed senior leadership from the Start-Up were involved in the robbery, drugging, and sexual assault that took place in her home. *Id.* ¶ 92. She instructed Morahan not to disclose her sexual assault to 72andSunny's leadership, but Morahan nevertheless disclosed the report to Cavallone. *Id.* ¶ 93.

On September 30, 2022, Plaintiff discussed the sexual assault, robbery, and harassment with Cavallone, including that she believed that executives from the Start-Up had arranged, orchestrated, and at least in part perpetrated the assault and robbery. *Id.* ¶ 96. She told Cavallone that 72andSunny needed to cut contact with the Start-Up. *Id.* Cavallone agreed with her about potential solutions, including cutting contact, but the solutions were never implemented. *Id.* A few days after she reported the events, Cavallone scheduled her first performance review. *Id.* Plaintiff stated that this was not an appropriate time for a review. *Id.*

Plaintiff continued to have conversations with Cavallone and HR representatives about solutions for keeping her safe. They discussed her moving to a new apartment, replacing electronic work devices, and 72andSunny providing security for her. *Id.* Plaintiff stated that she was afraid the Start-Up's founders would kill her if they found out what she had disclosed to 72andSunny and stated that her life was in danger. *Id.* She stated that 72andSunny and Stagwell needed to discontinue the business relationship for her safety and the safety of others. *Id.*

In mid-October 2022, Plaintiff attempted to disclose the sexual assault, robbery, and harassment to Cole. *Id.* ¶ 96. She asked for his support in navigating the situation because no actions had been taken to address the issue despite her conversations with HR. *Id.* Cole shut

down the conversation, would not allow her to tell him any details, and told her that he would not discuss these issues anymore and would be cancelling their one-on-one meetings. *Id.*

On October 17, 2022, Plaintiff disclosed the sexual assault, robbery, and ongoing harassment to Emily Venizelos, Global Head of Human Resources at 72andSunny. *Id.* Venizelos seemed surprised by Cavallone's response to Plaintiff's report and indicated that it was up to 72andSunny's President, Evin Shutt ("Shutt"), not Cavallone, to determine how to respond to Plaintiff's concerns. *Id.* Venizelos stated that she would escalate the issue to Shutt.

Plaintiff called Shutt in October 2022 and repeatedly expressed how afraid she was of the Start-Up. *Id.* Shutt stated that 72andSunny would not take the requested steps to protect Plaintiff from the Start-Up. *Id.* In response to Plaintiff's concern that 72andSunny featured the Start-Up on its social media accounts, Shutt stated "We're going to continue with the status quo." *Id.* On November 2, 2022, Plaintiff emailed Shutt noting that she has "been trying to get proper support on this for over a month now" and stating "[i]t would be great if the agency could prioritize creating a safe space for me to deliver my best." *Id.*

72andSunny granted Plaintiff's request to take two weeks of paid time off and promised that it would provide security for her if she had to attend any advertising productions with clients in New York or Los Angeles, *id.* ¶¶ 96, 99, but it refused to assure Plaintiff that she would never work with the Start-Up going forward, *id.* ¶ 99. 72andSunny continued to work with the Start-Up and sent other Black female employees to attend events with the Start-Up, which Plaintiff feared could place 72andSunny employees in danger. *Id.* ¶ 96.

On December 3, 2022, Plaintiff reported to Venizelos that the Start-Up founders were harassing her by phone. *Id.* 72andSunny granted Plaintiff additional paid leave to begin therapy and find a new home, but did not sever the relationship with the Start-Up. *Id.* Plaintiff

attempted to speak to Cole again that month, but he refused to let her tell him what happened and yelled at her. *Id.*

Plaintiff asked Shutt to escalate the situation with Stagwell, and Venizelos promised Plaintiff that Shutt was escalating the matter and was speaking with the appropriate people at Stagwell. *Id.* ¶ 100.

In January 2023, Plaintiff took medical leave under the Family Medical Leave Act ("FMLA"). *Id.* ¶ 102. She indicated that the basis for medical leave was the need to address the trauma she suffered from the sexual assault and ongoing exposure to Start-Up executives. *Id.* ¶ 103. At the time she took FMLA leave, she had been working full-time for 72andSunny for over 12 months. *Id.* ¶ 104.

Prior to taking FMLA leave, Plaintiff managed eight direct reports and several high-profile accounts, including 1800 Tequila and Smirnoff. *Id.* ¶ 107. When Plaintiff returned from leave in March 2023, 72andSunny removed all of her direct reports and gave her key accounts to less qualified male subordinates, while maintaining her as the "cultural" advisor on the accounts. *Id.* ¶¶ 109–10. 72andSunny also began cancelling meetings with her and excluding her from leadership meetings. *Id.* ¶ 111. Cavallone began pitching Plaintiff's ideas and presenting ad campaigns that Plaintiff had conceptualized and built, but listed her last on publications despite her significant contributions to the work. *Id.* ¶ 111. By May 2023, Plaintiff had been frozen out of her accounts and substantial amounts of work had been taken away from her. *Id.* ¶ 112.

Upon Plaintiff's return, Cavallone presented Plaintiff with feedback from her September 2022 performance review. He did not solicit feedback from the individuals Plaintiff had mentioned and instead presented her with criticism from two junior creatives about whom Plaintiff had previously raised complaints. *Id.* ¶ 114. Plaintiff noted this connection, and

Cavallone said the review was initial information and that they would regroup to discuss the full performance review soon. *Id.* ¶ 115.

In mid-June 2023, Plaintiff attended the week-long Sport Beach conference at Cannes which was jointly hosted by 72andSunny and Stagwell. *Id.* ¶ 117. Executives from the Start-Up attended this event and Plaintiff panicked when she saw them. *Id.* ¶ 118. She approached Shutt, pulled her aside, and confronted her about the situation. *Id.* Shutt blamed Plaintiff for the Start-Up's presence because Plaintiff had stated she wanted to keep private that she had made disclosures concerning the Start-Up. *Id.*

On June 19, 2023, Plaintiff reported the sexual assault, robbery, and harassment to Damaune Journey, 72andSunny's Chief Marketing Officer, who was conciliatory and expressed prior knowledge of the situation, but provided no solutions. *Id.* ¶ 120. On June 21, 2023, Plaintiff asked Cavallone why 72andSunny continued to partner with the Start-Up despite her complaint against the founders. *Id.* ¶ 121. He told Plaintiff that 72andSunny would not "back out" of the partnership with the Start-Up because it was too interwoven into 72andSunny and Stagwell's network of businesses and 72andSunny was too publicly connected to the Start-Up. *Id.* ¶¶ 96, 122. Cavallone also discussed Plaintiff's future at 72andSunny, specifically stating that he wanted her to build a new team to support 1800 Tequila and get the business back on track. *Id.* ¶ 124. Plaintiff stated that Defendants would be responsible if members of the Start-Up harmed her or another employee; Cavallone nodded in response. *Id.* ¶ 96.

On June 23, 2023, Plaintiff reported the sexual assault, robbery, and harassment to Brittany Allen, 72andSunny's Head of Diversity, Equity, and Inclusion. *Id.* ¶ 126. Allen stated that she would work to support Plaintiff. *Id.*

On July 13, 2023, Plaintiff sent a "final plea" to Shutt and Venizelos, telling them it was "highly concerning" that the "men you know threatened and harmed me were in attendance" at Stagwell's Sport Beach and "you haven't done anything to wind down the relationship." *Id.* ¶ 127. She stated, "I have not been properly reintegrated into any work flow since medical leave. And I feel that I am being discriminated against. All of my direct reports were taken, I have no business to work and when I'm doing my best to create new opportunities for business to work on in Cannes, I've been retraumatized." *Id.* ¶ 128.

That same day, July 13, 2023, 72andSunny terminated Plaintiff's employment ostensibly due to "financial hardships" but commended her performance and contributions. *Id.* ¶ 129. Plaintiff alleges that though 72andSunny claims it removed Plaintiff's title from its operations, a white man currently holds the role of Group Creative Director at 72andSunny's New York office. *Id.* ¶ 131. Plaintiff further alleges that Cavallone discussed Plaintiff building a new team a month prior to her termination. *Id.*

Plaintiff alleges that 72andSunny failed to promptly and thoroughly investigate her reports of harassment, assault, robbery, and drugging. *Id.* ¶ 133. Instead, they conducted a belated and self-serving investigation, during which the Start-Up's founders shared information and evidence with 72andSunny and Stagwell. *Id.* ¶¶ 134–35. 72andSunny and Stagwell did not interview Plaintiff as part of the investigation and did not share the results of the investigation with her, despite sharing the results with the Start-Up's founders. *Id.* ¶¶ 135–37.

## II. Mistreatment of Black Employees and Clients

Plaintiff additionally alleges that there was a pattern of race discrimination at 72andSunny. *Id.* ¶ 138. She observed that 72andSunny permitted white producers to berate and abuse Black clients during shots. *Id.* ¶ 140. During her first production with 72andSunny, Plaintiff worked with a client, a Black woman, who is an experienced and knowledgeable

executive and works for a major corporation. *Id.* ¶ 142. 72andSunny's production and creative divisions treated the client as if she lacked experience and knowledge, including dismissing her out of hand, speaking to her in a condescending manner, and responding to requests with hostility. *Id.* ¶ 143. An on-site producer told Plaintiff that 72andSunny did not care about the account, and producers assigned to the account yelled at the client's racially diverse representatives. *Id.* ¶ 144. 72andSunny's production and creative divisions did not treat its white clients with disrespect and condescension and never said that they did not care about a white client's account. *Id.* ¶ 145.

Plaintiff spoke to the lead producer about the on-site producer's behavior, *id.* ¶ 146, and also spoke with HR and Cavallone about mistreatment of the client, *id.* ¶ 147. Plaintiff stated, in sum and substance, "I can't sit and watch this Black woman be treated in this way." *Id.*

Plaintiff also alleges that a Black woman who worked at 72andSunny as a brand director took medical leave because she was suffering from depression as a result of being bullied. *Id.* ¶ 149. Plaintiff reported to HR and Cavallone that the employee was being undermined, bullied, and targeted. *Id.* ¶¶ 149–50. Monahan, the HR representative, told Plaintiff "This is why we need more Black leaders" and Monahan and Brett Edgar, President of 72andSunny's New York City-based operations, asked Plaintiff to mediate the dispute between the employee and her colleague. *Id.* ¶ 151.

One of Plaintiff's direct reports, a Black man, frequently worked with other executives and reported to Plaintiff about the disrespectful, dismissive, and negative comments that a white creative director at 72andSunny made toward him. *Id.* ¶ 152. A Black female employee left 72andSunny after being passed over for opportunities that were given to non-Black employees.

*Id.* ¶ 153. One Black employee was berated in front of a group of people, while white employees were not treated in a similar way. *Id.* ¶ 154.

Plaintiff alleges that a white man in the position of Executive Creative Director took a leave of absence after his wife discovered that he was having an affair with a younger woman in the office and he had to complete divorce and custody proceedings. *Id.* ¶ 156. When he returned from leave, he was promoted to Executive Creative Director at Large, which offered him more flexibility and the ability to work on a wider range of accounts. *Id.* ¶ 158.

**PROCEDURAL HISTORY**

Plaintiff filed this complaint on August 26, 2025. Dkt. No. 1. On November 24, 2025, Plaintiff filed the Amended Complaint ("AC"). Dkt. No. 19.[2] The AC alleges claims for sex and race discrimination, and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 200e *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin Code. §§ 8-101 *et seq.*, AC ¶¶ 166–201, a retaliation claim under the Family and Medical Leave Act ("FMLA"), 29 U.S.C §§ 2611 *et seq.*, *id.* ¶¶ 163–65, and a claim under the New York Labor Law ("NYLL") § 215, *id.* ¶¶ 202–05.

Defendants filed this motion to dismiss on December 4, 2025. Dkt. No. 23. Defendants also filed a memorandum of law in support of the motion and the declaration of Felice Ekelman. Dkt. Nos. 24–25. On January 8, 2026, Plaintiff filed a memorandum of law in opposition to the motion to dismiss. Dkt. No. 26. On January 22, 2026, Defendants filed a reply memorandum of law in further support of the motion to dismiss. Dkt. No. 27. On April 28, 2026, Defendants

[2] Plaintiff attempted to file the amended complaint on November 20, 2025, but it was rejected by the Clerk of Court for a filing error. Dkt. No. 18.

filed a letter withdrawing their argument that Plaintiff's claim for retaliation under the FMLA should be dismissed for failure to plead that she was entitled to FMLA leave. Dkt. No. 43.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).

A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Twombly*, 550 U.S. at 555, 557. The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Infinitives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

Defendants argue that all claims against Stagwell should be dismissed because Plaintiff failed to exhaust administrative remedies against Stagwell under Title VII and Plaintiff fails to plausibly allege that Stagwell was her employer. Dkt. No. 24 at 6–11. Defendants also argue that Plaintiff's claims of discrimination and retaliation should be dismissed against all Defendants pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to allege facts that

would support an inference of discrimination. *Id.* at 11–23. Defendants argue that they cannot be held liable for the actions of individuals associated with the Start-Up, and thus Plaintiff's experience of assault and harassment cannot support a theory of gender discrimination through hostile work environment.[3] *Id.* at 18–21.

## I. Claims against Stagwell

As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC. *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003). "The administrative exhaustion requirement applies to pro se and counseled plaintiffs alike." *Fowlkes v. Ironworkers Loc. 40*, 790 F.3d 378, 384 (2d Cir. 2015) (citing *Pikulin v. City Univ. of N.Y.*, 176 F.3d 598, 599–600 (2d Cir. 1999) (per curiam)). "[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982); *Fowlkes*, 790 F.3d at 393–98. Because exhaustion is an affirmative defense, the defendant bears the burden of establishing the plaintiff's failure to timely exhaust administrative remedies. *See Broich v. Inc. Vill. of Southampton*, 650 F. Supp. 2d 234, 246 (E.D.N.Y. 2009); *see Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 491 (2d Cir. 2018) ("[T]he burden of pleading and proving Title VII exhaustion lies with defendants and operates as an affirmative defense."). Moreover, as an affirmative defense, exhaustion "can only be a proper basis for a motion to

[3] As noted above, Defendants withdrew their argument that Plaintiff's claim of retaliation under the FMLA should be dismissed for failure to plead that she was entitled to FMLA leave. Dkt. No. 43. On reply, Defendants do not respond to Plaintiff's argument that she adequately stated a claim for retaliation under the NYLL, Dkt. No. 27, and the Court deems Defendants to have abandoned their argument that the Court should dismiss the NYLL claim. *See Doe v. Indyke*, 465 F. Supp. 3d 452, 466 (S.D.N.Y. 2020).

dismiss under Rule 12(b)(6) if failure to exhaust appears on the face of the complaint." *Johnson v. Westin N.Y.*, 2024 WL 2055346, at *3 (S.D.N.Y. May 8, 2024).

"Title VII requires that individuals aggrieved by acts of discrimination file a charge with the EEOC within 180 or, in states like New York that have local administrative mechanisms for pursuing discrimination claims, 300 days after the alleged unlawful employment practice occurred." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2018) (internal quotation marks omitted); *see* 42 U.S.C. § 2000e-5(e)(1); *Gindi v. N.Y.C. Dep't of Educ.*, 786 F. App'x 280, 282 (2d Cir. 2019) (summary order). As a general rule, the EEOC charge must name each defendant as a party. *See, e.g.*, *Johnson v. M. Melnick & Co.*, 104 F.3d 355 (2d Cir. 1996) (holding that defendant not named in EEOC charge was not a proper defendant).

Defendants argue that Plaintiff's claims against Stagwell should be dismissed because Plaintiff did not file an EEOC charge naming Stagwell as a respondent; Plaintiff's EEOC charge only named 72andSunny as a Respondent. Dkt. No. 24 at 6–7; Dkt. No. 25-1. Plaintiff argues that she was not required to file an EEOC charge as to Stagwell, because Stagwell shares an identity of interest with 72andSunny and Stagwell and 72andSunny operated as joint employers. Dkt. No. 26 at 13–14.

"[C]ourts have recognized an exception to the general rule that a defendant must be named in the EEOC complaint," the "identity of interest" exception, which "permits a Title VII action to proceed against an unnamed party where there is a clear identity of interest between the unnamed defendant and the party named in the administrative charge." *Johnson v. Palma*, 931 F.2d 203, 209 (2d Cir. 1991). This exception reflects the Second Circuit's "flexible stance in interpreting Title VII's procedural provisions so as not to frustrate Title VII's remedial goals"

since EEOC charges "generally are filed by parties not versed in the vagaries of Title VII and its jurisdictional and pleading requirements." *Id.*

> To determine whether an identity of interest exists, the court weights four factors:
>
> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named party are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Artis v. Phelps Mem'l Hosp. Ass'n*, 2025 WL 888528, at *6 (S.D.N.Y. Mar. 21, 2025); *accord Palma*, 931 F.2d at 209–10. The affirmative defense of timeliness can be raised on a "pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998); *see Domitz v. City of Long Beach*, 737 F. App'x 589 (2d Cir. Sept. 14, 2018) (summary order) (timeliness properly considered on motion to dismiss where "the complaint contained information that suggested the EEOC charge was not timely filed"). Once the defendant has challenged the failure to exhaust, the burden is on the plaintiff to plead and ultimately prove that an identity of interest exists such that the exhaustion requirement is met. *See Hill v. Citibank Corp.*, 312 F. Supp. 2d 464, 473–74 (S.D.N.Y. 2004) (citing *Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1010 (11th Cir. 1982)); *see also Rivers v. Int'l House of Pancakes*, 2021 WL 860590, at *4 (S.D.N.Y. Mar. 8, 2021). At the motion to dismiss stage, the plaintiff must point to allegations in the complaint that would demonstrate an identity of interest. *Rivers*, 2021 WL 860590, at *4 (evaluating whether plaintiff fulfilled burden through the allegations of the complaint). *But see Lopez v. Nassau Cnty. Sheriffs Dep't*, 2018 WL 3321430, at *5 (E.D.N.Y. July 5, 2018) (permitting *pro se* plaintiff to submit an affidavit setting

forth facts in support of application of equitable tolling, following motion to dismiss due to statute of limitations).

Here, there is no question that Plaintiff was able to ascertain the role of Stagwell at the time she filed the EEOC charge: she pleads that she asked Shutt to escalate the matter to Stagwell and was later promised by Venizelos that Shutt was speaking with the appropriate people at Stagwell. AC ¶ 100. As to the second factor, Plaintiff has failed to demonstrate that the interests of 72andSunny and Stagwell are so similar that conciliation on the part of Stagwell would be unnecessary. Plaintiff's allegations center on 72andSunny's decision to terminate her employment and its response to her reporting the sexual assault and harassment, and include an allegation that Shutt failed to sufficiently raise the latter issue with Stagwell. *See id.* ¶ 118 (allegation that Shutt told Plaintiff that the Start-Up founders' presence at a Stagwell event was Plaintiff's fault because she wanted to keep her disclosures concerning the Start-Up private). Plaintiff does not allege that she directly raised a complaint with Stagwell. An EEOC investigation might have revealed that Stagwell was unaware of the nature of Plaintiff's complaint against the Start-Up's founders, and thus the basis of her discrimination complaint, or had no role in the decisions that led to Plaintiff's grievances, such as the clients she worked with, her assignments, or the number of staff reporting to her. *See Palma*, 931 F.2d at 210 (factor weighs against identity of interest where EEOC investigation would reveal that unnamed defendant had no role in grievance); *Percy v. New York (Hudson Valley DDSO)*, 264 F. Supp. 3d 574, 592 (S.D.N.Y. 2017) (shared employee between named and unnamed entity as subject of complaint insufficient to establish identity of interest; the two entities must be "far more intertwined"). Plaintiff's allegations do not support an inference that Stagwell and 72andSunny shared similar roles in the grievances raised in her EEOC charge or that Stagwell was involved in

72andSunny's complaint resolution process. *Cf. Artis*, 2025 WL 888528, at *7 (factor weighs in plaintiff's favor where he alleged that unnamed defendant owned named defendant, and employees were directed to raise complaints of discrimination with the unnamed defendant and submit such complaints through unnamed defendant's system); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.2d 1235, 1242 (2d Cir. 1995) (identical interests where unnamed entity in EEOC charge approved all personnel decisions at named entity). Moreover, as noted below, "if named, [Stagwell] may have been able to establish that it was not [Plaintiff's] employer and had no liability." *Caesar v. Interoute Telecomms., Inc.*, 2001 WL 648946, at *2 (S.D.N.Y. June 12, 2001).

The third factor also weighs against Plaintiff. Prejudice can arise where the unnamed defendant is "forced to participate in proceedings to resolve a dispute when it played absolutely no role in the cause of that dispute." *Palma*, 931 F.2d at 210. Had Stagwell been able to participate in the EEOC process, it may have established that it was unaware of Plaintiff's complaint, played no role in her grievances, and/or was not her employer—arguments that 72andSunny was unlikely, in light of the allegations of the complaint, to have an interest in making. Alternatively, Stagwell may have been able to "initiate[] steps toward conciliation or resolution" within the EEOC proceedings. *See Kearney v. Kessler Family LLC*, 2011 WL 2693892, at *4 (W.D.N.Y. July 11, 2011) (finding prejudice to unnamed entity's interest in potentially resolving complaint through EEOC proceedings). Though some courts find no prejudice where EEOC proceedings resulted in no conciliation or action against the named respondent, *see Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 312 (S.D.N.Y. 2014), where it is "unclear whether the EEOC engaged in any attempt at conciliation from which [the unnamed entity] was excluded," the factor at most weighs neutrally, *see Percy*, 264 F. Supp. 3d

at 574. Plaintiff has not presented any allegations regarding the procedures or attempts at conciliation employed by the EEOC. In any event, even if Plaintiff were able to demonstrate the absence of prejudice to Stagwell, this factor is not dispositive. *See Nelson v. Argyropoulous*, 2021 WL 4927059, at *4 (S.D.N.Y. Mar. 18, 2018), *report and recommendation adopted*, 2021 WL 4352326 (S.D.N.Y. Sept. 24, 2021) ("[C]ourts have declined to apply the identity of interest exception at the motion to dismiss stage, even in the absence of actual prejudice even when the other factors weigh against application of the exception." (internal quotation marks and citation omitted)).

Finally, there are no allegations that Stagwell represented to Plaintiff that its relationship to her would be conducted through 72andSunny or that 72andSunny would otherwise represent its interests. The fourth factor thus also weighs against Plaintiff. *See, e.g.*, *Nelson*, 2021 WL 4927059, at *4 (absence of allegations weighs against plaintiff for fourth factor); *Percy*, 264 F. Supp. 3d at 592 (same). Defendants' motion to dismiss Stagwell as a defendant for failure to exhaust administrative remedies is therefore granted.

Moreover, even if Plaintiff had exhausted her administrative remedies as to Stagwell, she has not alleged that Stagwell was her employer. "[T]he existence of an employer-employee relationship is a primary element of Title VII claims." *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006); *see also Munson v. Diamond*, 2017 WL 4863096, at *5 (S.D.N.Y. June 1, 2017), *report and recommendation adopted*, 2017 WL 4862789 (S.D.N.Y. Oct. 26, 2017) (plaintiff must establish an employer-employee relationship for claims under Title VII, NYSHRL, and NYCHRL). The Second Circuit has recognized "that 'in certain circumstances' an employee may 'assert employer liability against an entity that is not formally his or her employer.'" *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 842 (2d Cir. 2022) (quoting *Arculeo v.*

*On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005)). One such circumstance arises through the joint employer doctrine, whereby "'an employee, formally employed by one entity' is 'assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity.'" *Id.* (quoting *Arculeo*, 425 F.3d at 198). In that circumstance, the employee "may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer.'" *Id.* (quoting *Arculeo*, 425 F.3d at 198).

"[A] joint employer relationship [exists] when two or more entities, according to common law principles, share significant control of the same employee." *Felder*, 27 F.4th at 843. The Second Circuit has relied on common law principles of agency and evaluated the existence of an employer-employee relationship by examining "whether the alleged employer 'paid [the employees'] salaries, hired and fired them, and had control over their daily employment activities.'" *Id.* (quoting *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 214 (3d Cir. 2015)). "[T]he crux of these factors is the element of control." *Id.* (internal quotation marks and citation omitted); *see also Clinton's Ditch Co-op Co. v. N.L.R.B.*, 778 F.2d 132, 137 (2d Cir. 1985) ("[I]t is rather a matter of determining which of two, or whether both, [employers] control, in the capacity of employer, the labor relations of a given group of workers."); *Serv. Emps. Int'l Union, Loc. 32BJ v. N.L.R.B.*, 647 F.3d 435, 442 (2d Cir. 2011) ("'[A]n essential element' of any joint employer determination is 'sufficient evidence of immediate control over the employees.'" (quoting *Clinton's Ditch*, 778 F.2d at 138)).

Plaintiff argues that she has adequately alleged that Stagwell acted as Plaintiff's "joint employer." Dkt. No. 26 at 14. The allegations as to the relationship between Stagwell, 72andSunny, and Plaintiff are as follows: 72andSunny is a subsidiary of Stagwell, AC ¶ 2;

Stagwell refers to 72andSunny executives on its website as members of "our team" and references its subsidiaries as "the special sauce of the Stagwell network," *id.* ¶¶ 11–12; Stagwell has oversight and control of 72andSunny's operations and finances, including serving as the administrator of the 401(k) and health plans for all employees, *id.* ¶ 13; Plaintiff told Cavallone that 72andSunny and Stagwell needed to discontinue the business relationship with the Start-Up and asked Shutt to escalate the situation with Stagwell, *id.* ¶¶ 96–97; and Stagwell and 72andSunny conducted an investigation into Plaintiff's complaint, *id.* ¶ 134.

These allegations may suggest a close business relationship between 72andSunny and Stagwell but they are insufficient to allege that Stagwell was Plaintiff's joint employer. Plaintiff's allegations do not indicate that Stagwell had any level of control over hiring, firing, salaries, or daily employment activities; Plaintiff's allegation that Stagwell provided financial "oversight" and served as the administrator of 401(k) and health plans for employees does not indicate that Stagwell made decisions as to the scope of those plans or any other aspect of Plaintiff's compensation. *See Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 436 (S.D.N.Y. 2017) (that defendant made recommendations that ultimately influenced classification, and attendant rate of pay, "does not establish control by [defendant] over that decision"); *id.* ("[T]he test is whether a putative joint employer determines pay rates, not whether it affects them." (quoting *Jean-Louis v. Metro. Cable Comm'ns, Inc.*, 838 F. Supp. 2d 111, 129–30 (S.D.N.Y. 2011))). Though Plaintiff's request to escalate her allegations to Stagwell may reflect that Plaintiff perceived Stagwell to have influence over 72andSunny's actions, it does not indicate that Stagwell had control over her daily employment activities; even if Stagwell had high-level oversight of 72andSunny's business, that would be insufficient to allege a joint-employer relationship. *See In re Domino's Pizza Inc.*, 2018 WL 4757944, at *8 (S.D.N.Y.

Sept. 30, 2018) (Defendants' "standard-setting and enforcement through audits and inspection, though extensive, do not constitute control of the terms of Plaintiff's employment.").

Nor does 72andSunny's status as a subsidiary of Stagwell and the other facts alleged by Plaintiff support a finding that 72andSunny and Stagwell were both Plaintiff's employers as part of an "integrated enterprise." *Gulino*, 460 F.3d at 378. "[A] group of distinct but closely affiliated entities should be treated as a single employer" when they operate as a "single integrated enterprise." *Juarez v. 449 Rest., Inc.*, 29 F. Supp. 3d 363, 367 (S.D.N.Y. 2014). This analysis is distinct from whether two defendants acted as joint-employers: while "the joint employer test assumes that the two entities are separate and distinct," in a single integrated enterprise, "all the employees of the constituent entities are employees of the overarching integrated entity." *Romero v. Garner Env't Servs., Inc.*, 2025 WL 3638397, at *4 (S.D.N.Y. Dec. 15, 2025) (quoting *Arculeo*, 425 F.3d at 199). The single-integrated-enterprise test examines "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Cook*, 69 F.3d at 1240; *see Radio & Television Broad. Technicians Loc. Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965); *Shukla v. Viacom Inc.*, 2019 WL 1932568, at *8 (S.D.N.Y. May 1, 2019). "Although no one factor controls the analysis, the second, 'centralized control of labor relations,' is the most significant." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 156 (2d Cir. 2014) (quoting *Cook*, 69 F.3d at 1240). "The fact of corporate ownership is not enough to establish a single integrated enterprise: there is 'a strong presumption that a parent is not the employer of its subsidiary's employees.'" *Romero*, 2025 WL 3638397, at *4 (quoting *Balut v. Loral Elec. Sys.*, 988 F. Supp. 339, 344 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1199 (2d Cir. 1998)).

The AC does not include allegations sufficient to overcome the presumption that the corporate form should be honored and that Stagwell is not the employer of its subsidiary's employees. Plaintiff's allegations that Stagwell provided financial oversight and administered benefits are insufficient to support a plausible claim of integrated enterprise. *See Cassard v. Omnicom Media Grp. Holdings, Inc.*, 2025 WL 3227617, at *5 (S.D.N.Y. Nov. 19, 2025) (fact that parent company "managed [plaintiff's] employment benefits, retirement plans, and equity awards [does not] give rise to a plausible inference that [parent company] controlled labor relations at [subsidiary]"). That two businesses may share a common business purpose does not make them an integrated enterprise. *See Huer Huang v. Shanghai City Corp.*, 459 F. Supp. 3d 580, 587 (S.D.N.Y. 2020). Plaintiff provides no other allegations to support a finding that 72andSunny and Stagwell shared common management, ownership, control of labor relations, or had interrelated operations. The failure to allege that Stagwell was Plaintiff's employer provides an independent basis why the AC must be dismissed against it.

Plaintiff has provided no information that would suggest it could cure the deficiencies in the AC as to Stagwell. Due to the failure to exhaust administrative remedies and the failure to allege that Stagwell was Plaintiff's employer, Defendants' motion to dismiss the AC as to Stagwell is thus granted with prejudice.

## II. Discrimination on the Basis of Race and Gender

Plaintiff brings claims of discrimination against Stagwell and 72andSunny on the basis of her race and gender under Title VII, the NYSHRL, and the NYCHRL. The claims against Stagwell are dismissed with prejudice on timeliness grounds and for failure to allege that Stagwell was Plaintiff's employer. The motion to dismiss as to the claims of gender discrimination is denied and the motion as to the claims of race discrimination is granted without prejudice.

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). When only indirect evidence of intent to discriminate is available, discrimination claims under Title VII are subject to the three-step burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Bart v. Golub Corp.*, 96 F.4th 566, 569 (2d Cir. 2024) ("To succeed on a Title VII disparate treatment claim, a plaintiff must prove discrimination either by direct evidence of intent to discriminate or, more commonly, by indirectly showing circumstances giving rise to an inference of discrimination." (internal quotations omitted)); *DeMuth v. U.S. Small Bus. Admin.*, 819 F. App'x 23, 25 (2d Cir. 2020) (summary order); *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015). Under that framework, a plaintiff must first establish "a *prima facie* case of discrimination." *DeMuth*, 819 F. App'x at 25. To do so, she must show that "(1) she belonged to a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Fischman v. Mitsubishi Chem. Holdings Am., Inc.*, 2023 WL 4763257, at *5 (S.D.N.Y. July 26, 2023) (citing *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); and *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). "To make out a Title VII discrimination claim, [plaintiff] must show some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 354–55 (2024). She need not show that she suffered a materially adverse change in the terms and conditions of her employment or that the harm suffered was "significant." *See id.* at 355; *Back v. Hapoalim*, 2024 WL 4746263, at *2 (2d Cir. Nov. 12, 2024) (summary order).

Importantly, "a plaintiff is not required to plead a *prima facie* case under *McDonnell Douglas*, at least as the test was originally formulated, to defeat a motion to dismiss." *Vega*, 801 F.3d at 84. "[A]t the initial stage of a litigation, the plaintiff's burden is 'minimal'—he need only plausibly allege facts that provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" *Id.* at 86–87 (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)). "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in [discriminatory] terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). Nevertheless, "a discrimination complaint . . . must [still] at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (alterations and internal quotation marks omitted). Additionally, "the elements of a *prima facie* case may be used as a prism to shed light upon the plausibility of the claim." *Littlejohn*, 795 F.3d at 311 n.9 (internal quotation marks omitted); *accord Vega*, 801 F.3d at 84 n.7 (same).

Defendants argue that Plaintiff has failed to allege any facts connecting her race or gender to any adverse action and has failed to raise an inference of discrimination by identifying a similarly situated comparator. Dkt. No. 24 at 12–13. Plaintiff argues that the AC raises a plausible inference of intentional discrimination through allegations that 72andSunny currently employs a white man in Plaintiff's former position, that a similarly situated comparator was

treated more favorably, and that 72andSunny discriminated towards others in her protected class. Dkt. No. 26 at 17–19.

Plaintiff has properly alleged that she is a member of a protected class and that she is qualified for the position she was terminated from, having worked in the position for almost three years prior to her termination. AC ¶¶ 8, 40, 129. Defendants do not dispute that Plaintiff's termination constitutes an adverse action that affected negatively the terms and conditions of her employment. Dkt. No. 24 at 13. At this stage, the Court further assumes that the removal of all her direct reports, reassignment of key accounts, and exclusion from leadership meetings following her return from FMLA leave additionally constitute adverse actions under *Muldrow*. *See Muldrow*, 601 U.S. at 359 (adverse action alleged through, *inter alia*, transfer accompanied by more administrative tasks, less opportunity to work with higher ranked officers, and less prestige); *Ashmeade v. Amazon.com*, 2026 WL 880645, at *9 (S.D.N.Y. Mar. 31, 2026) (allegations of assignment to a higher workload with a greater proportion of menial tasks sufficient to allege harm); *Anderson v. Amazon.com*, 2024 WL 2801986, at *10 (S.D.N.Y. May 31, 2024) ("diminished role" with, *inter alia*, worse assignments, dampened prospects of promotion, and exclusion from meetings and projects sufficient to allege harm). Accordingly, the question is whether Plaintiff has properly pleaded sufficient facts to raise a plausible inference of intentional discrimination as to her race and gender, and whether she has properly pleaded that discrimination was a "but-for" cause of these actions. *See McConkey v. Churchill Sch. & Ctr.*, 2025 WL 2062195, at *8 (S.D.N.Y. July 23, 2025); *Eugene v. City of New York*, 2026 WL 1831351, at *7 (S.D.N.Y June 25, 2026).

Taken together, Plaintiff's allegations are sufficient to meet her minimal burden to raise a plausible inference of intentional discrimination as to her gender; her allegations are insufficient

to raise a plausible inference of discrimination as to her race. Plaintiff first argues that she has adequately alleged an inference of intentional discrimination as to both of her protected characteristics because, as of the filing of her complaint, 72andSunny employs a white man in her former position. Dkt. No. 26 at 19; AC ¶ 131. "The fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage of the Title VII analysis, including at the pleading stage." *Littlejohn*, 795 F.3d at 313; *accord Sapio v. Selux Corp.*, 844 F. App'x 456, 457 (2d Cir. 2021) (summary order); *see Franchino v. Terence Cardinal Cook Health Care Ctr., Inc.*, 692 F. App'x 39, 43 (2d Cir. 2017) (summary order) (inference of discrimination raised by allegation that male plaintiff was replaced by female employee may be undercut by allegations that other factors motivated termination).[4] Similarly, "a plaintiff has demonstrated an inference of [] discrimination and thus established a *prima facie* case . . . where the majority of plaintiff's responsibilities were transferred" to an employee outside of her protected class. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000).

Plaintiff's allegation that a white man presently occupies her former position at 72andSunny, however, does not itself raise a plausible inference of discrimination as to either her race or her gender. Plaintiff's employment was terminated in June 2023. She filed the AC in November 2025. Nearly two and a half years separated these two events. Plaintiff does not allege when within that two-year period the present occupant of her job was hired or whether there were persons other than the current occupant of the position who had Plaintiff's job after her termination. That a white man now holds Plaintiff's position—particularly if others took that

[4] That is not invariably the case. *See Luo v. AIK Renovation Inc.*, 2024 WL 4444283, at *8 n.9 (S.D.N.Y. Oct. 8, 2024) (inference of discrimination may be undercut by other allegations in the complaint).

position in the interim—does not necessarily say anything about whether Plaintiff's employment was terminated because of her race or her gender. *See David v. Comtech PST Corp.*, 2006 WL 2713936, at *10 (E.D.N.Y. Sept. 22, 2006) ("That a younger employee hired three years after she was terminated has on rare occasion performed tasks similar to those she performed simply does not raise an inference of discrimination."); *cf. Peloquin v. Securitas Sec. Servs., USA, Inc.*, 2010 WL 2825720, at *2 (D. Conn. July 15, 2010) (in assessing whether plaintiff was "replaced" by younger employees, limiting analysis to first two subsequent employees who were under forty years old, rather than fifty-seven-year-old man who later occupied the position). For all that Plaintiff has alleged, it is possible that she was replaced in her job by a Black woman who then left for a different position at the company.

Plaintiff, however, alleges more. She also alleges that, shortly prior to her termination, all of her accounts and direct reports were transferred to less-qualified male employees. AC ¶¶ 110, 130. Particularly when considered with Plaintiff's other allegations, this allegation is sufficient to establish a plausible inference that Plaintiff suffered discrimination on account of her gender. *See Williams v. N.Y.C. Dep't of Educ.*, 2018 WL 4735713, at *10 (S.D.N.Y. Sept. 29, 2018) (noting the "Second Circuit's repeated admonitions that alleging replacement by or reassignment of duties to employees outside the protected class raises an inference of discrimination." (citing *Littlejohn*, 795 F.3d at 312–13; *Carlton*, 202 F.3d at 135–36)); *see Wallace v. Esper*, 2019 WL 4805813, at *8 (S.D.N.Y. Sept. 30, 2019) (allegation that plaintiff's "work was reassigned to a less qualified male employee before she was ultimately terminated . . . suffices to meet the '*de minimis*' burden" at pleading stage); *Doe v. Paychex, Inc.*, 2019 WL 2027080, at *7 (D. Conn. May 6, 2019) (allegation that plaintiff's exclusive accounts were opened to male colleagues sufficient at pleading stage). The AC does not include allegations that

would otherwise undercut that plausible inference. *See Luo*, 2024 WL 4444283, at *8 n.9; *cf. Wu v. Good Samaritan Hosp. Med. Ctr.*, 2019 WL 2754865, at *4 (E.D.N.Y. July 2, 2019), *aff'd*, 815 F. App'x 575 (2d Cir. 2020) (summary order) (allegation that plaintiff was replaced by a male employee of a different race was undercut by allegation that defendant terminated the employment of all physicians in plaintiff's unit); *Mansaray v. Kraus Sec. Sys.*, 2021 WL 183275, at *4 (S.D.N.Y. Jan. 19, 2021) (discriminatory inference undercut by allegations that defendant and replacement had a long-running friendship, defendant hired and fired plaintiff, with firing taking place a relatively short time after hiring, and plaintiff and replacement were not similarly situated).[5]

Plaintiff has not alleged facts that would support even the minimal inference that she was the victim of racial discrimination. Plaintiff relies primarily on allegations that 72andSunny treated other Black employees and clients less favorably than white employees and clients, Dkt. No. 26 at 17–18, and that 72andSunny treated a white man more favorably than it treated her, *id.* at 18–19. In particular, she alleges that a Black client was treated dismissively and disrespectfully but that white clients were not treated dismissively and disrespectfully, AC

[5]At the pleading stage, facts alleged in a complaint "need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 311. However, at summary judgment, courts often focus not on whether plaintiff has established a *prima facie* case but on that "ultimate question" posed to the jury: whether "the plaintiff proved that it is more likely than not that he or she was subjected to the adverse employment action based on an illegal discriminatory motive[.]" *Luo*, 2024 WL 4444283, at *7 (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 53 (2d Cir. 1998)). Thus, while Plaintiff's allegations that her assignments were transferred to male employees is sufficient to meet her "minimal" burden at the pleading stage, *Littlejohn*, 795 F.3d at 311, at summary judgment, Plaintiff may need to show more than that the functions she previously performed were later performed by persons who did not share her protected characteristic. *See Marseille v. Mount Sinai Health Sys., Inc.*, 2021 WL 3475620, at *9 (S.D.N.Y. Aug. 5, 2021) (no reasonable jury would find that non-discriminatory justification for termination was pretextual based solely on replacement by someone outside of plaintiff's protected class).

¶¶ 142–45; that a Black colleague received feedback from white executives that his work was not "good enough" and that a white creative director made "disrespectful, dismissive, and negative" comments towards him, *id.* ¶ 152; that another Black employee was berated in front of a group of people, *id.* ¶ 154; and that a Black female employee was "constantly passed over for opportunities that were given to non-Black employees," *id.* ¶ 153. She additionally alleges that a Black employee was being "undermined, bullied, and targeted" and that, after Plaintiff reported the issue to HR, Plaintiff was tasked with mediating between the Black employee and her colleague. *Id.* ¶ 151. As to herself, she argues that following her personal leave she was treated less well than a white male Executive Creative Director was treated following his period of personal leave, *id.* ¶¶ 156–58.

An inference of discriminatory intent may arise when the plaintiff is treated differently than a person who is similarly situated but of a different race or gender. *Carris v. First Student, Inc.*, 682 F. App'x 30, 32 (2d Cir. 2017) (summary order) (complaint raises inference of discrimination where it alleges "the more favorable treatment of employees not in the protected group" who are "similarly situated in all material respects" (first quoting *Littlejohn*, 795 F.3d at 312; then quoting *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014))). In order for the court to draw an inference of discriminatory intent, there must be well-pled allegations that the comparator is similarly situated to the plaintiff. *Id.* In the absence of allegations that the two are similarly situated, it would be speculative to presume that race was the reason for the differential treatment. It would be "possible" but not necessarily "plausible" that the plaintiff was the victim of race discrimination. *See Twombly*, 550 U.S. at 679. It follows that general allegations that a plaintiff is treated less well than an employee who does not share her protected characteristic cannot satisfy the third prong of the *McDonnell-Douglas* test. *See Eugene*, 2026 WL 1831351,

at *8 (plaintiff failed to allege similarly situated comparators where she relied on broad allegations regarding "white colleagues" without providing allegations as to those colleagues' positions, experience, or supervision); *Paupaw-Myrie v. Mount Vernon City Sch. Dist.*, 653 F. Supp. 3d 80, 99 (S.D.N.Y. 2023) ("Identification of a 'generic class of [similarly situated] white . . . employees that allegedly received better treatment is insufficient even at the pleadings stage" (internal quotation marks and citation omitted)). Assuming a workplace that is large enough and a category of comparators that is broad or general enough, a plaintiff will always be able to find some employee who is treated differently and better than he or she is.

Plaintiff presents a proposed similarly situated comparator who she alleges was treated more favorably than she was treated following a period of personal leave. Plaintiff alleges that a white man who held the position of Executive Creative Director took a leave of absence in the midst of his divorce proceedings and, upon his return, was not subjected to any adverse treatment and instead promoted to Executive Creative Director at Large. AC ¶¶ 156–58. Defendant argues that this proposed comparator is not similarly situated to Plaintiff because he held the role of "Executive Creative Director," whereas Plaintiff was employed as a "Group Creative Director." Dkt. No. 24 at 14; AC ¶¶ 34, 156. At the motion to dismiss stage, a plaintiff "need not provide factual allegations that would *definitively prove* such comparators are similarly situated; rather, he or she must merely provide sufficient allegations that would permit the Court to 'plausibly infer a reasonably close resemblance' between the plaintiff and the alleged comparator." *Rodriguez v. Excellus BlueCross BlueShield, Inc.*, 2024 WL 196747, at *5 (N.D.N.Y. Jan. 17, 2024) (quoting *Hu v. City of New York*, 927 F.3d 81, 101 (2d Cir. 2019)) (emphasis in original). However, at the pleading stage, Plaintiff must plead more than she has. Plaintiff has provided no allegations as to the nature or responsibility of the "Executive Creative Director" role, or whether

it encompasses similar responsibilities to Plaintiff's role, occupies the same level of rank or seniority, or is subject to the same supervision standards. *See Solomon v. Fordham Univ.*, 2020 WL 1272617, at *12 (S.D.N.Y. Mar. 17, 2020) (plaintiff failed to allege similarly situated comparators where she only offered comparators who were "differentiated in their administrative roles or seniority"); *cf. Daikin Am. Inc.*, 756 F.3d at 230 (allegations that plaintiff and comparator are "subject to the same standards governing performance evaluation and discipline" sufficient to allege that they are similarly situated); *Palmer v. Shchegol*, 406 F. Supp. 3d 224, 232 (E.D.N.Y. 2016) (plaintiff proposed similarly situated comparators where she alleged that comparators "held responsibilities equivalent to her own and were similarly ranked," even though one comparator did not have equivalent job title). Absent further allegations, the Court cannot conclude that Plaintiff has sufficiently alleged that the Executive Creative Director is a similarly situated comparator.

An inference of discriminatory intent also may "arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz*, 584 F.3d at 502). Thus, "[a]n inference of discriminatory intent may arise from an employer's invidious comments about others in the employee's protected group," even where such comments are not directed at Plaintiff herself. *See Mitchell v. Planned Parenthood of Greater N.Y.*, 745 F. Supp. 3d 68, 95 (S.D.N.Y. 2024) (quoting *Myers v. Doherty*, 2022 WL 4477050, at *2 (2d Cir. Sept. 27, 2022) (summary order)). "In analyzing whether remarks are probative of discriminatory animus or whether they are just stray remarks, courts assess '(1) who made the remark, i.e., a

decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decisionmaking process." *Pierre v. City of N.Y.*, 2020 WL 353538, at *8 (S.D.N.Y. Jan. 21, 2020), *aff'd*, 844 F. App'x 411 (2d Cir. 2021) (summary order) (quoting *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 519 (S.D.N.Y. 2004)).

Plaintiff has not alleged invidious comments directed either towards her or towards Black colleagues and clients that are reflective of racial animus. *See, e.g.*, *Turley*, 774 F.3d at 148 (plaintiff presented evidence of direct racial animus where coworkers regularly used racial slurs, directly referenced plaintiff's race in a demeaning manner, and referred to plaintiff, who was Black, as a "gorilla" and "King Kong"); *Feingold v. New York*, 366 F.3d 138, 150–51 (2d Cir. 2004) (evidence of overt animus where plaintiff was subjected to almost-daily antisemitic remarks, including "What's wrong with these [Jewish] people?"). She also has not alleged circumstances leading to her departure that are suggestive of racial animus. Once the allegation of Plaintiff's treatment relative to the Executive Creative Director is put aside, Plaintiff is left only with allegations about how others were treated at 72andSunny. But Plaintiff fails to allege that any of those circumstances are reflective of racial animus or bear any relation to any adverse employment action taken against her.

Plaintiff alleges that a Black employee was the subject of disrespectful comments made by a white employee and that another Black employee was berated in front of a group of people, *id.* ¶¶ 152, 154, while "[w]hite employees were not treated with this level of hostility," *id.* ¶ 154. But she does not allege who made the comments, when they were made, what was said, or that the comments were made by anyone who had any involvement in the employment decisions with

respect to her. Moreover, without any allegation regarding who the Black employee was and who the white employees were, it is impossible to draw the plausible inference that the reason why the Black employees drew the criticism was because of their race. *See Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 408 (S.D.N.Y. 2014) (general allegation that "Caucasian employee[s] are not subject to any of the aforementioned conduct" insufficient to "nudge her claims [of differential treatment] across the line from conceivable to plausible" (cleaned up)); *Eisenberg v. N.Y.C. Dep't of Educ.*, 2025 WL 2022093, at *15 (E.D.N.Y. July 18, 2025) (allegation that "non-disabled comparators did not receive this mistreatment in response to attendance" insufficient to plausibly allege discrimination). Likewise, the fact that Plaintiff is able to identify a Black employee who was repeatedly passed over for promotions given to non-Black employees does not give rise to an inference of discrimination. There are no allegations as to who made the decisions, when they were made, or about the relative qualifications of the two applicants. *See Spires v. MetLife Grp., Inc.*, 2021 WL 3544719, at *5 (S.D.N.Y. Aug. 10, 2021) (to raise an inference of discrimination for failure to promote, plaintiff must allege that she and the more favorably treated employee had similar qualifications). From all that Plaintiff alleges, it may well be that there were also white applicants that were passed over for other positions in favor of Black applicants. Finally, the claim that 72andSunny treated dismissively a client that happened to be run by a Black woman and did not care about the account, AC ¶¶ 142–44, while alleging that 72andSunny did not treat white clients' accounts with the same disrespect, *id.* ¶ 145, does not say that the accounts were treated differently because of the race of their owners. Allegations about the level of criticism made by an anonymous person at an unspecified time and directed at particular Black clients and employees, when there is no allegation that the comments themselves evinced racial animus, provide no support for an inference of discrimination as to

Plaintiff's removal of responsibilities and termination. *See Johnson v. L'Oreal USA*, 2021 WL 4482167, at *12 (S.D.N.Y. Sept. 30, 2021) ("To support an inference of discriminatory intent, there must be a nexus between the discriminatory comments and the adverse employment action.").

Plaintiff further alleges that a Black woman employed at 72andSunny took a leave of absence because she was being "undermined, bullied, and targeted." AC ¶ 149–50. Plaintiff again does not allege who made the statements, when they were made, or that the statements evinced racial animus. The fact that the woman happened to be Black does not indicate that she was criticized because she was Black. Indeed, the only allegation that Plaintiff makes connecting this employee's experience to her race is the allegation that in response to Plaintiff reporting the employee's experience, the HR representative stated, in sum and substance, "This is why we need more Black leaders." *Id.* ¶ 151. This remark, even if it could be interpreted to reflect racial animus, is insufficient to raise an inference of discriminatory intent as to Plaintiff's termination and removal of responsibilities in 2023, as Plaintiff does not allege when the remark was made, who made it, or that it had any relation to the employment decisions with respect to Plaintiff. *See Wagh v. Wilkie*, 2020 WL 5732035, at *13 (S.D.N.Y. Sept. 24, 2020) (noting that courts evaluate whether a remark is probative of discrimination based on, *inter alia*, "when the remark was made in relation to the employment decision at issue").

Of course, it may be possible that a series of events no one of which could raise an inference of discriminatory intent could, when viewed together, support such an inference. *See Vega*, 801 F.3d at 86 ("bits and pieces of information" can together form "a mosaic of intentional discrimination" (internal quotation marks and citation omitted)). An executive who routinely disciplines persons of one race without also disciplining persons of a different race may plausibly

be understood to be acting on the basis of race even if, with respect to any one act of discipline, the plaintiff is not able to point to a comparator who is similarly situated. In a pattern and practice case, statistics "alone can make out a prima facie case of discrimination if the statistics reveal a gross disparity in employee treatment." *E.E.O.C. v. Bloomberg L.P.*, 778 F. Supp. 2d 458, 468 (S.D.N.Y. 2011) (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 158 (2d Cir. 2001)); *Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 82–83 (S.D.N.Y. Mar. 30, 2018) (statistical evidence of differential treatment can support a discriminatory inference). But Plaintiff does not plead this case as a pattern or practice case. And in the absence of evidence of a pattern or habit, the fact that there exist Black employees and Black clients who in a series of apparently unrelated events are treated differently than potentially differently situated persons of a different race says only that a person of one race may be treated differently than a person of a different race. It says nothing about whether that difference is because of race.

Defendants' motion to dismiss Plaintiff's claims of discrimination under Title VII is thus denied as to Plaintiff's claim of discrimination on the basis of gender and granted as to Plaintiff's claim of discrimination on the basis of her race.

## III. Hostile Work Environment

Plaintiff also brings a claim of discrimination on the basis of gender due to a hostile work environment. She argues that 72andSunny is responsible for permitting her to be harassed and exposed to her abusers at work and that Defendants' inadequate response to her allegations of harassment and assault perpetrated by the Start-Up exposes them to liability for the creation of a hostile work environment. Dkt. No. 26 at 19–21. Defendants argue that they cannot be held liable for the actions of the Start-Up, and thus Plaintiff has failed to state a claim of hostile work environment. Dkt. No. 24 at 18–21.

### A. Legal Standards for Hostile Work Environment

The Court's analysis of Plaintiff's hostile work environment claim is guided by several well-established principles.

First, "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). "'[T]he phrase 'terms, conditions or privileges of employment' in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination' or sexual discrimination." *Id.* (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied*, 406 U.S. 957 (1972)). A hostile work environment under Title VII arises when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 240 (2d Cir. 2007) (quoting *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)); *see Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (plaintiff must show that the "workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his or her] employment were thereby altered"). A hostile work environment is one that "(1) [i]s objectively severe or pervasive in that it created an environment that a reasonable person would find hostile or abusive; (2) create[s] an environment that the plaintiff subjectively perceived as hostile or abusive; and (3) occur[s] because of the plaintiff's protected characteristic." *Sherman v. Fivesky, LLC*, 2020 WL 2136227, at *5 (S.D.N.Y. May 5, 2020). A plaintiff may satisfy the objective prong by demonstrating "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000).

Second, "[i]n order to prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (quoting *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)). The plaintiff must demonstrate "that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir. 1998); *accord Roches-Bowman v. City of Mount Vernon*, 2022 WL 3648394, at *6 (S.D.N.Y. Aug. 24, 2022).

Different standards for employer liability apply depending upon whether it is the employee's supervisor or co-employee who creates the hostile work environment. The severe or pervasive conduct of a supervisor that creates a hostile work environment is imputed to the employer, subject only to the employer's affirmative defenses. "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). Such liability stems from principles of agency law. *See id.* at 754; *Faragher v. City of Boca Raton*, 524 U.S. 775, 791–92 (1998). "When a person with supervisory authority discriminates in the terms and conditions of subordinates' employment, his actions necessarily draw upon his superior position over the people who report to him, or those under them." *Faragher*, 524 U.S. at 803. In addition, "[r]ecognition of employer liability when discriminatory misuse of supervisory authority alters the terms and conditions of a victim's employment is underscored by the fact that the employer has a greater opportunity to guard against misconduct by supervisors than by common workers; employers

have greater opportunity and incentive to screen them, train them, and monitor their performance." *Id.* The employer thus can avoid liability for the supervisor's harassing conduct that creates a hostile work environment only "by proving two necessary elements by a preponderance of the evidence: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth,* 524 U.S. at 765. In sum, "an employer is presumed absolutely liable in cases where the harassment is perpetrated by the victim's supervisor, although employers may interpose an affirmative defense to rebut that presumption." *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 441 (2d Cir. 1999).

An employer can also be liable for the hostile work environment created by the plaintiff's co-workers. *See Ferris v. Delta Air Lines*, 277 F.3d 128, 135 (2d Cir. 2001). However, "when the harassment is attributable to a coworker, rather than a supervisor, . . . the employer will be held liable only for its own negligence." *Duch*, 588 F.3d at 762 (quoting *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998)). The Supreme Court has reasoned that, unlike with respect to a supervisor, "[w]hen a fellow employee harasses, the victim can walk away or tell the offender where to go." *Ellerth*, 524 U.S. at 803. Thus, "[w]hen the source of the alleged harassment is a co-worker, the plaintiff must demonstrate that the employer 'failed to provide a reasonable avenue for complaint or [that] it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" *Howley*, 217 F.3d at 154 (quoting *Richardson,* 180 F.3d at 441)).

Third, an employer also can be held liable for a hostile work environment created by non-employees, but with an additional gloss. The court applies a similar standard to that applicable

with respect to sexually abusive or harassing conduct by co-employees "with the qualification that we 'will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees.'" *Summa*, 708 F.3d at 124 (quoting 29 C.F.R. § 1604.11(e)). "[T]he conduct of certain non-employees may be imputed to the employer where (1) the employer exercises a high degree of control over the behavior of the non-employee, and (2) the employer's own negligence permits or facilitates that non-employee's discrimination." *Leroy v. Delta Air Lines*, 2022 WL 12144507, at *3 (2d Cir. Oct. 27, 2022) (summary order) (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 39 (2d Cir. 2019)). "Relevant to the question whether an 'employer was negligent in failing to prevent harassment from taking place' is '[e]vidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed.'" *Ball v. Marriott Int'l, Inc.*, 627 F. Supp. 3d 296, 318 (S.D.N.Y. 2022) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 449 (2013)). Control is assessed based on the employer's knowledge of the assailant's prior behavior. *See Creacy v. BCBG Max Azria Grp., LLC*, 2017 WL 1216580, at *10 (S.D.N.Y. Mar. 31, 2017). For example, "generally, an employer is not liable for failing to prevent an act of harassment by a first-time customer." *Swiderski v. Urban Outfitters, Inc.*, 2015 WL 3513088, at *3 (S.D.N.Y. June 4, 2015).

Fourth, the work environment is not necessarily confined to the four corners of an office, the store, or the factory floor. The hostile work environment that Title VII proscribes is that which alters the employee's "terms, conditions, or privileges of employment." 42 U.S. § 2000e-2(a)(1); *see Meritor*, 477 U.S. at 64 ("[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate

treatment of men and women' in employment" (quoting *Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 707, n.13 (1978)). A supervisor's hostile treatment of an employee can create a hostile work environment even if that treatment occurs outside the physical workplace where there is a "nexus" between the supervisory authority of the assailant and the assault. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1306 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998); *see Ferris*, 277 F.3d at 135 n.2 (noting that finding of liability in *Tomka* depended on supervisor assaulting plaintiff after business dinner). An employer thus can be liable for the sexual assault committed by the employee's supervisors committed en route back from a business dinner the employee was directed to attend, which took place while the supervisors and the employee were on a business trip. *See Tomka*, 66 F.3d at 1301–02.

In *Tomka*, even though the assault occurred outside the physical workplace, there was a "nexus" between the supervisory authority of the assailants and the assault on the victim. *Id.* at 1306. The supervisors "used their actual or apparent authority to accomplish the rape." *Id.* The court also stated that liability would arise (now, post-*Ellerth/Faragher*, subject to the affirmative defenses) if the supervisors were otherwise aided by the existence of the agency relationship to carry out the assaults. *Id.* In sum, even if outside of the workplace, where there is a sufficient nexus between supervisory authority and the harassment, such that a jury could find a "discriminatory misuse of supervisory authority," vicarious liability attaches. *Faragher*, 524 U.S. at 803–04; *see also Ellerth*, 524 U.S. at 748 (comments by supervisor in hotel lounge during a business trip); *Meritor*, 477 U.S. at 60 (supervisor made sexual demand at offsite dinner repeated by regular demands for sexual favors and other harassing behavior both during and outside of business hours).

A somewhat different standard applies when the harassing activity is committed by a co-worker or a non-employee. *See Ferris*, 277 F.3d at 135 n.2. It is not sufficient that the assault has a nexus to business. The "aided-by-agency-relation principle" that supports employer liability in the case of a supervisor does not apply to co-employees or non-employees. *Faragher*, 524 U.S. at 803–04. The employer is not vicariously liable for the torts of the co-employee or non-employee who is not aided by agency but rather is liable based on "its own negligence." *Duch*, 588 F.3d at 762. It follows then that the employer's duty of care extends to only that over which it has control—generally areas and chattel over which it has control. *See* Restatement (Second) of Torts § 317; *cf. Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (negligent supervision or retention requires, as an element, that the tort was committed on the employer's premises or with the employer's chattels); *see also Argento v. Airborne Freight Corp.*, 933 F. Supp. 373, 377 (S.D.N.Y. 1996) ("Under common law, it is the employer . . . that owes employees a duty to exercise reasonable care in the workplace."). Thus, "[a]s a general rule, 'employers are not responsible under Title VII for hostile sexual acts resulting from nonwork-related, off-duty interactions between co-employees,' because those actions are not part of the work environment." *Devlin v. Tchrs.' Ins. & Annuity Ass'n of Am.*, 2003 WL 1738969, at *2 (S.D.N.Y. Apr. 2, 2003) (quoting *Feliciano v. Alpha Sector, Inc.*, 2002 WL 1492139, at *8 (S.D.N.Y. July 12, 2002)). The misconduct must occur "in [the] work environment." *Ferris,* 277 F.3d at 135.

In *Ferris*, the Second Circuit considered whether an assault of the plaintiff by a co-employee occurring in "the lodging of an airline's flight crew during a brief layover in a foreign country in a block of hotel rooms booked and paid for by the employer" took place in a work environment and created a hostile work environment. *Id.* The Circuit held that the lodging could

be considered to be a work environment because, while "the employer did not direct its employees as to how to spend their off-duty hours, the circumstances of the employment tend to compel th[e] results" that the employees would "band together for society and socialize as a matter of course in one another's hotel rooms." *Id.* The court stated that the case presented a "special set of circumstances," where because of the employer's control over the hotel rooms and transport to the rooms, the fact that the crew members would have no other acquaintances in the foreign location and "little opportunity to develop private lives," the plaintiff's hotel room could be considered to be part of the employer's "work environment within the terms of Title VII." *Id.*[6] The court further considered that there existed a basis for finding the employer negligent and therefore imputing the conduct of the assailant to the employer. *Id.* The employer had notice of the assailant's "proclivity to rape co-workers"; it not only did nothing about it but went so far as to take affirmative steps to prevent a prior victim from warning others about the risks to them. *Id.* at 136. The court concluded: "If an employer is on notice of a likelihood that a particular employee's proclivities place other employees at unreasonable risk of rape, the employer does not escape responsibility to warn or protect likely future victims merely because

[6] *See, e.g.*, *Heskin v. Insite Advert., Inc.*, 2005 WL 407646, at *22 (S.D.N.Y. Feb. 22, 2005) (where co-workers traveled to a new city for a business event and went to a dance club with a client representative because the client was considering the club for a future event, court could not determine that club was not part of the work environment as a matter of law); *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008) (though adopting a distinct standard, citing *Ferris* for the proposition that assault in a hotel room while employee was at a work-related training center staying in an employer-provided hotel "[grew] out of the workplace environment"); *Doe 1 v. World Wrestling Ent., LLC*, 811 F. Supp. 3d 706, 723–24 (D. Md. Dec. 10, 2025) (hotel rooms paid for by company for wrestling events were part of the work environment because they were premises in possession of the employer and circumstances of employment were "sufficiently connected to the premises"); *cf. Griffin v. DeLage Landen Fin. Servs., Inc.*, 2005 WL 3307535, at *3 (E.D. Pa. Dec. 5, 2005) (citing *Ferris* and holding that dinner between two colleagues who were previously in a romantic relationship to discuss their expectations for work did not occur in the "work environment" and company had no obligation with respect to physical assault that occurred afterwards).

the abusive employee has not previously abused those particular employees." *Id.*

Finally, an employer can be liable for offsite conduct committed by a co-employee or non-employee where the employer knows of and in effect adopts the offending conduct, "as if [it] had been authorized affirmatively as the employer's policy." *Faragher*, 524 U.S. at 789; *see Turley*, 774 F.3d at 149–50 (finding employer liable where, in response to coworker harassment, supervisors "appeared to encourage some of the behavior" by failing to intervene when witnessing harassment and laughing about incidents of harassment). In that instance, it is not the offsite conduct that itself constitutes the hostile work environment but the on-site reaction to the conduct. *See Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002).

In *Little*, the plaintiff was assaulted by a client who was not her supervisor following a business dinner. *Id.* at 964. When she reported the incident to leadership, she was not removed from responsibility for the client's account, she was informed that reporting the rape would probably jeopardize her career, and when she did report the rape to the company president, her compensation was immediately decreased and she was fired two days later. *Id.* at 965. The Ninth Circuit held that there existed triable issues whether the employer had created a hostile work environment, not because of the assault after the dinner, but on the basis that defendant's "reaction to the rape created a hostile work environment." *Id.* at 966. It reasoned that the employer's "subsequent actions reinforced rather than remediated the harassment," "effectively condoned a rape by a business colleague," and created "genuine issues of material fact as to whether [defendant] ratified or acquiesced in the harassing conduct." *Id.* at 968–99; *see also Rodriguez-Hernandez v. Miranda-Velez*, 132 F.3d 848, 854–55 (1st Cir. 1998) (reasonable jury could find a hostile work environment was created when a supervisor refused to intervene after a firm client made sexual advances toward an employee, and instead "conditioned her future with

the company on her responding to the unwanted sexual demands of a customer"). In effect, the offsite conduct becomes actionable when it creates a hostile environment inside the workplace. *See Ellison v. Brady*, 924 F.2d 872, 883 (9th Cir. 1991) ("[I]n some cases the mere presence of an employee who has engaged in particularly severe or pervasive harassment can create a hostile working environment."); *Temperali v. Rubin*, 1997 WL 361019, at *3 (E.D. Pa. June 20, 1997) ("[r]equiring the victim of sexual harassment to work under the supervision of the harasser may 'alter the conditions of the victim's employment' and create an 'abusive working environment'") (quoting *Fuller v. City of Oakland, CA*, 47 F.3d 1522, 1527 (9th Cir. 1995)).[7]

**B. Allegations of the Amended Complaint**

The foregoing principles guide the analysis of this motion.

Plaintiff alleges a series of acts by the founders of the Start-Up that she considers to be hostile: (1) in the spring of 2021, one of the founders of the Start-Up told Plaintiff he admired her, demanded that she hug him, "constantly" texted her, and declared his love for her, which she rebuffed, AC ¶ 51; (2) one year later, in June 2022, at Cannes, Plaintiff witnessed the Start-Up's executives drinking excessively and shouting at people attending the festival, and one of the executives attempted to enter Plaintiff's hotel without permission, *id.* ¶ 56; (3) on July 24, 2022, in advance of the networking brunch, one of the founders took off his shirt in Plaintiff's apartment and began pacing around and another threatened to have her raped, *id.* ¶¶ 63, 67; (4)

[7] In addition, off-site context may be relevant to a claim of hostile work environment in that, at a minimum, it may bear on whether the plaintiff subjectively viewed the on-site conduct as hostile and abusive on the basis of a protected characteristic. *See, e.g.*, *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 409 (1st Cir. 2002) ("evidence of non-workplace conduct [can] help determine the severity and pervasiveness of the hostility in the workplace as well as to establish that the conduct was motivated by gender"); *see also Turley*, 774 F.3d at 148 (harassing message in employee's personal car contributed to pattern of workplace harassment); *Brown v. N.Y. State Dep't of Corr. Servs.*, 583 F. Supp. 2d 404, 418 (W.D.N.Y. 2008) (noting that incidents outside of workplace "[a]t the very least . . . provide context for the incidents that did occur at work, and they tend to show the motivation for the harassing behavior of plaintiff's coworkers").

that same day, at the networking brunch, the founders acted inappropriately, drank excessively, peppered Plaintiff with questions about her family and personal matters, and professed their feelings for her, *id.* ¶¶ 71–72; and (5) on September 5 and 6, 2022, Plaintiff was drugged and sexually assaulted in her apartment by intruders whom she believes to be executives of the Start-Up. *Id.* ¶¶ 67, 78, 82.

The comments from the Spring of 2021 and the conduct at Cannes, viewed in isolation, would not be sufficient to create a hostile work environment based on gender. Title VII does not enact "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). The same can be said with respect to the conduct at the brunch. Drinking excessively and asking someone about their personal life and expressing feelings for them on a single occasion does not create a hostile work environment. *See Rivera v. Apple Indus. Corp.*, 148 F. Supp. 2d 202, 218 (E.D.N.Y. 2001) (derogatory nicknames regarding plaintiff's disability, though "childish and mean-spirited," insufficiently pervasive to state claim of hostile work environment); *Sutton v. N.Y.C. Transit Auth.*, 2009 WL 5092989, at *6 (E.D.N.Y. Sept. 30, 2009) (alleged kiss, repeated phone calls, and an unspecified number of instances of staring insufficient to establish a hostile work environment).

The conduct must be viewed collectively, however, and other conduct—the threats of rape and the actual physical assault—undoubtedly are sufficiently severe that in and of themselves they could create a hostile work environment. "Rape is unquestionably among the most severe forms of sexual harassment." *Little*, 301 F.3d at 967. Indeed, "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability." *Tomka*, 66 F.3d at 1304–05; *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 180 (2d Cir. 2012) ("Direct contact with

an intimate body part constitutes one of the most severe forms of sexual harassment."); *Ferris*, 277 F.3d at 136 ("We have no doubt a single incident of rape can satisfy the first prong of employer liability under a hostile work environment theory."); *see also Berry v. Chicago Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010) ("[A] single act can create a hostile environment if it is severe enough, and instances of uninvited physical contact with an intimate part of the body are among the most severe types of sexual harassment."); *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 436 (5th Cir. 2005) ("Undoubtedly, the deliberate and unwanted touching of Harvill's intimate body parts can constitute severe sexual harassment."); *Turnbull v. Topeka State Hosp.*, 225 F.3d 1238, 1243 (10th Cir. 2001) (court could "easily conclude" that jury's conclusion that plaintiff was subject to hostile work environment was reasonable where she was raped by patient).

Plaintiff does not allege that the Start-Up's founders and employees were her supervisors. They were business clients of 72andSunny. AC ¶¶ 26–27, 46. The question thus is whether the conduct occurred in the workplace and, if so, whether Plaintiff has pleaded negligence by 72andSunny. If the conduct did not occur in the workplace or if 72andSunny was not negligent, the question is whether Defendant knew of "and in effect adopt[ed] the offending conduct, as if [it] had been authorized affirmatively as the employer's policy." *Faragher*, 524 U.S. at 789. Plaintiff comes up short on that analysis.

Plaintiff has not alleged facts sufficient to support that any of the conduct by the executives or founders of the Start-Up that could create a hostile environment occurred in the workplace. The conduct in the Spring of 2021 and at Cannes did not take place in the workplace. Plaintiff does not allege the location of the Spring 2021 comments nor does she allege the context of the allegedly inappropriate conduct at Cannes: she alleges that she witnessed the

Start-Up executives "excessively drinking and shouting at people" who attended the festival and that "after hours" one of them tried to access her hotel. AC ¶ 56. Even assuming that Cannes was part of her work environment, she has not alleged that the conduct complained of occurred within the festival itself and, even if she had, the conduct alleged is insufficient to support a hostile work environment claim. As to the rape threat and the assault, both occurred in Plaintiff's apartment; the other alleged behavior occurred in the community space on the rooftop. There is no allegation that 72andSunny controlled either location. Plaintiff describes the apartment as her "home." AC ¶ 75. It is not akin to the hotel rooms rented by the defendant in *Ferris* for airline employees when they were away from home. Moreover, from Plaintiff's allegations, she—and not 72andSunny—controlled the space. She made the decision to invite the Start-Up founders in. AC ¶ 74. And, after the assault, it was she, and not 72andSunny, who had the authority to "wor[k] with her landlord and property manager to change the locks on her doors and obtain security footage." *Id.* ¶ 87. The same can be said for the community space on the rooftop of her apartment building. Plaintiff commonly hosted networking events and executives from 72andSunny had attended past events hosted by her. AC ¶ 59. There is no allegation that 72andSunny had any association with the networking event much less any control over the space or any responsibility for the conduct of persons who were not its supervisory employees that occurred within it.

It may be that the executives and founders of the Start-Up would not have known of Plaintiff but for the employment relationship, but that is not enough to make 72andSunny responsible for the subsequent conduct of those individuals. *See Ellerth*, 524 U.S. at 760 (rejecting "[p]roximity and regular contact" of coworkers as a basis for employer liability). That Plaintiff felt a professional obligation towards the Start-Up founders does not transform any

interaction with them, no matter how removed from 72andSunny, into a workplace incident. A threat and an assault taking place in private outside of working hours in an offsite location by a non-employee cannot serve as a basis for a claim of hostile work environment. *See Duggins ex rel. Duggins v. Steak'N Shake, Inc.*, 3 F. App'x 302, 311 (6th Cir. 2001); *Devlin*, 2003 WL 1738969, at *2 (sexual assault by co-employee at celebratory drinks that supervisors encouraged employees to attend was not part of work environment because employer neither compelled attendance nor supervised or controlled the event); *James v. Port Auth. Police Dep't*, 2025 WL 966016, at *2 (S.D.N.Y. Mar. 31, 2025) (harassment by co-worker at holiday party that was not sanctioned by employer could not support claim); *Torres v. City of New York*, 2019 WL 1765223, at *4 (S.D.N.Y. Apr. 22, 2019) (harassment that took place "at an 'off-duty police social event'" did not occur in the work environment); *Krause v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2011 WL 1453791, at *4 (S.D.N.Y. Apr. 13, 2011) (granting defendant employer summary judgment because, *inter alia*, employer could not be liable for alleged incidents of harassment that occurred at plaintiff's apartment following an off-site social event).

There is furthermore no well-pled allegation that 72andSunny either knew about the risk of an assault and did nothing about it or that it provided no reasonable avenue for complaint, even if it were required to do so. *See Duch*, 588 F.3d at 762. Plaintiff does not allege that she made any complaint to 72andSunny prior to the assault that would have alerted them that the founders or executives presented a risk to Plaintiff. The most that she alleges is that she told Cole in June 2022 that she did not plan to attend an event at which the Start-Up's founders would be in attendance, but she does not allege that she told Cole the basis upon which she was declining to attend, much less that the basis at that time would have included conduct that indicated the executives were engaged in sexual harassment. AC ¶ 57. The conduct at Cannes

for the most part consisted of the executives engaging in rowdy behavior. *Id.* ¶ 56. Plaintiff alleges that it was not until September 29, 2022, after the threat and assault, that she "got the courage to disclose to . . . [the] Head of Human Resources" her belief that "senior leadership from the Start-up were involved in a series of crimes against her." *Id.* ¶ 92. There is no well-pled allegation that, after she reported the incident, Defendants ever put Plaintiff in a position where she was harassed again by the Start-Up founders.[8] *See Duch*, 588 F.3d at 766 (employer could be held liable where "harassment persisted and escalated during the months that followed" plaintiff's complaint and employer did not investigate conduct for three months); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72–73 (2d Cir. 2000) (summary judgment not warranted where "harassment continues after complaints are made" as such "evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt" (internal quotation marks and citation omitted)); *cf. Ferris*, 277 F.3d at 136–37 (employer negligent despite taking remedial measures following plaintiff's harassment because it had prior knowledge of harassing conduct and could have prevented initial harassment).

Plaintiff also does not allege that 72andSunny lacked reasonable avenues for complaint. "[T]he relevant inquiry is not whether a *particular* avenue of complaint was effectively blocked, but, rather, whether defendants 'provided *no* reasonable avenue of complaint.'" *Duch*, 588 F.3d at 762–63 (quoting *Distasio*, 157 F.3d at 63). Indeed, Plaintiff did complain and, even if she was unsatisfied with the response, she was given assurance that the company would provide security

---

[8] Plaintiff alleges that following her assault and complaints, she reported that the Start-Up founders "were harassing her via phone." AC ¶ 96. The allegation that they "were harassing her" is too conclusory to support her claim. *See Lee v. Delta Air Lines*, 2026 WL 1879335, at *3 (S.D.N.Y. June 30, 2026) (allegation that coworker "sexually harassed [her] every single day" too conclusory to state a claim). Moreover, she does not allege whether such harassment took place through her work phone or in a manner that would render it within the work environment.

for her.[9] AC ¶ 99. Plaintiff has therefore failed to allege that 72andSunny was negligent in its response to her complaint, even if the conduct had occurred in the workplace. *See Ball*, 627 F. Supp. 3d at 319 (employer not liable where its response was "timely and appropriate in light of the circumstances" and "its own negligence did not permit or facilitate the discriminatory conduct" (cleaned up)).

The remaining question is whether 72andSunny's response to Plaintiff reporting her assault could itself create a hostile work environment. *See, e.g.*, *Little*, 301 F.3d at 966. Plaintiff alleges that she reported her assault on a number of occasions to varied individuals in leadership at 72andSunny: HR personnel, the co-founder, President, Head of Diversity, Equity, and Inclusion, and Chief Marketing Officer, among others. *See* AC ¶¶ 92, 96, 118–27. Plaintiff was disappointed with the result. 72andSunny did not fire the Start-Up as a client as Plaintiff desired. *Id.* ¶¶ 96, 122, 126. And Cole—72andSunny's co-founder—refused to discuss Plaintiff's complaint with her and yelled at her. *Id.* ¶ 96. But 72andSunny had no obligation to fire the Start-Up as a client in order to avoid being accused of endorsing their alleged assault. "[N]othing requires an employer to automatically fire one employee based on another's complaints." *Scoppettone v. Mamma Lombardi's Pizzico, Inc.*, 523 F. App'x 73, 75 (2d Cir. 2013); *see Russell v. N.Y. Univ.*, 739 F. App'x 28, 30–31 (2d Cir. 2018) (summary order) (rejecting plaintiff's argument that summary judgment is not warranted because "NYU could have easily done more"). *A fortiori*, the employer is not necessarily required to fire a client based on another's complaints. *Cf. Ball*, 627 F. Supp. 3d at 320 (employer is not required to ban

[9] Plaintiff argues that 72andSunny discussed providing security, but the AC does not allege that such security was actually provided. Dkt. No. 26 at 21. However, Plaintiff does not allege that she ever requested security and 72andSunny refused to provide it. More fundamentally, as noted above, the AC contains no well-pled allegations that Plaintiff was subject to a hostile work environment following her complaint.

customer from its premises (citing *Flower v. Mayfair Joint Venture*, 2000 WL 272187, at *9 (S.D.N.Y. Mar. 13, 2000)). And Plaintiff does not allege facts that support the inference that Cole, by his conduct, adopted the Start-Up founders' conduct as the conduct of 72andSunny. *Cf. Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1163 (9th Cir. 2017) (jury could find that defendant ratified rape where, pending investigation, supervisor sent email to office, including plaintiff, stating "feel free to give [assailant] encouragement" and that he "hated that [assailant] cannot come to the office until the investigation is complete"). 72andSunny responded to Plaintiff's complaint. It permitted Plaintiff to take paid time off so that she could move apartments and start therapy, promised to provide security for any productions in New York or Los Angeles, discussed exchanging all of her electronic devices, and expressed sympathy, but would not guarantee that she would not work with the Start-Up in the future or sever 72andSunny's relationship with the Start-Up.[10] AC ¶¶ 96, 99. It also conducted an investigation into Plaintiff's allegations.[11] *Id.* ¶¶ 134–37. Plaintiff alleges that leadership at 72andSunny was sympathetic to her experience. *See id.* ¶ 96 (Cavallone "expressed concern and was quite supportive" and Shutt made promises, though characterized as hollow, "to do what she could"); *id.* ¶ 126 (Head of Diversity, Equity, and Inclusion "stated that she would work to support" Plaintiff). Her allegations do not support a claim that 72andSunny condoned the Start-Up founders' conduct.

---

[10] The Amended Complaint neither alleges that Plaintiff was removed from responsibility for the Start-Up or that she remained the main point of contact. It solely alleges that 72andSunny "refused to assure [Plaintiff] that she would never work with the Start-Up going forward." AC ¶ 99.

[11] Plaintiff characterizes the investigation as "belated and self-serving" but does not allege when the investigation occurred or how it was self-serving. *See* AC ¶¶ 133–137.

Defendants' motion to dismiss Plaintiff's claim of hostile work environment is therefore granted.

## IV. Discrimination under NYSHRL and NYCHRL

Plaintiff brings claims of race and gender discrimination under the NYSHRL and NYCHRL.

As with Plaintiff's Title VII claims, "discrimination claims under . . . the NYSHRL[] and the NYCHRL are governed by the familiar three-part *McDonnell Douglas* burden-shifting framework." *Hanley v. N.Y.C. Health & Hosp. Corp.*, 722 F. Supp. 3d 112, 120 (E.D.N.Y. 2024) (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010)); *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75–76 (2d Cir. 2015) (applying burden-shifting framework to NYCHRL claim). Within this same burden-shifting framework, to state a claim for race discrimination under the NYCHRL, "the plaintiff need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of [his race].'" *Mihalik v. Credit Agricole Cheuvreaux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013). Following 2019 amendments to the NYSHRL, that more liberal standard applies to claims for race discrimination under the NYSHRL as well. *See Moukdad v. NYU Langone Health Sys.*, 2026 WL 774270, at *6 (S.D.N.Y. Mar. 18, 2026) (applying same standard to both NYSHRL and NYCHRL claims); *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122–23 (2d Cir. 2024) (in retaliation context, noting that following 2019 amendment, NYSHRL adopts "NYCHRL's more liberal pleading standard"). Under this standard, "a plaintiff must show that discrimination played a role in the employer's decision-making." *Brown v. Montefiore Med. Ctr.*, 2021 WL 1163797, at *8 (S.D.N.Y. Mar. 25, 2021) (citing *Ya-Chen Chen*, 805 F.3d at 75–76).

Under the NYCHRL, there "are not separate standards" for hostile work environment and discrimination claims. *Johnson v. Strive E. Harlem Emp. Grp.*, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014). Instead, "the former is subsumed into the latter[.]" *Rothbein v. City of New York*, 2019 WL 977878, at *9 n.12 (S.D.N.Y. Feb. 28, 2019). Courts therefore apply the same lenient standard to NYCHRL hostile work environment claims as they apply to discrimination claims brought pursuant to the NYCHRL: a plaintiff must allege she was treated "less well" due to her "membership in a protected class." *Bautista v. PR Gramercy Square Condominium*, 642 F. Supp. 3d 411, 427 (S.D.N.Y. 2022) (internal quotation marks and citations omitted). Similarly, pursuant to the 2019 amendments to the NYSHRL, stating a hostile work environment claim under NYSHRL now requires only that the plaintiff plead sufficient facts showing he was "subjected to inferior terms, conditions, or privileges of employment" due to his membership in a protected class. *Samuels v. City of New York*, 2023 WL 5717892, at *9 (S.D.N.Y. Sept. 5, 2023).

As Plaintiff has stated a claim for discrimination on the basis of gender under Title VII, her claims of gender discrimination under the NYSHRL and NYCHRL survive. *Shargani v. N.Y.C. Dep't of Env't Prot.*, 2022 WL 1046764, at *3 (S.D.N.Y. Apr. 7, 2022) ("Because Plaintiff's Title VII claims survive the motion to dismiss, his claims under the NYSHRL and NYCHRL do as well."); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (noting "more liberal[]" standard under NYCHRL).

As to Plaintiff's claim of race discrimination under the NYSHRL and NYCHRL, her claim fails for the same failure to allege indicia of direct racial bias or indirect racial bias through adequately alleged comparators. *See Eugene*, 2026 WL 1831351, at *12. Though the NYSHRL and NYCHRL have more liberal standards, they equally require a plaintiff relying on comparator evidence to allege that she was treated less favorably as compared to similarly situated

comparators. *See Mumin v. City of New York*, 760 F. Supp. 3d 28, 53 (S.D.N.Y. 2024) (dismissing NYSRHL and NYCHRL claims because plaintiff failed to identify similarly situated employees); *Benzinger v. Lukoil Pan Am., LLC*, 447 F. Supp. 3d 99, 122–23 (S.D.N.Y. 2020) (dismissing NYSHRL and NYCHRL claims for failure to adequately plead that proposed comparators are similarly situated and providing no other evidence of discriminatory animus). Plaintiff's claims under the NYSHRL and NYCHRL are thus dismissed, without prejudice, for the reasons articulated above: the AC does not adequately allege that Plaintiff's proposed comparators, as to either herself or others at 72andSunny, are similarly situated.

## V. Retaliation under Title VII

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). To survive a motion to dismiss a claim of retaliation under Title VII, the plaintiff must plausibly allege that defendants discriminated—or took an adverse employment action—against her because she has opposed an unlawful employment practice. *Vega*, 801 F.3d at 90. Stated otherwise, a plaintiff must allege: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 315–16.

To properly allege the first element, a plaintiff "need not prove that the conditions against which he protested actually amounted to a violation of Title VII." *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999). It is sufficient that she had a good faith reasonable belief that the underlying challenged actions of the employer violated the law. *Id.*

Even so, "[a] plaintiff's belief on this point is not reasonable simply because he or she complains of something that appears to be discrimination in some form." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 15 (2d Cir. 2013). Protected activity includes "informal protests of discriminatory employment practices, including making complaints to management," *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990), but generalized complaints about a supervisor's treatment unrelated to prohibited discrimination are not sufficient, *Mejia v. White Plains Self Storage Corp.*, 2020 WL 247995, at *6 (S.D.N.Y. Jan. 16, 2020) (collecting cases). Similarly, although complaints need not mention discrimination or use particular language, ambiguous complaints must make the employer aware of the alleged discriminatory misconduct to put the employer on notice. *See, e.g.*, *Mejia*, 2020 WL 247995, at *6; *Int'l Healthcare Exch. Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007); *Mootry v. Spotify USA Inc.*, 2026 WL 1971103, at *10 (S.D.N.Y. July 8, 2026). The knowledge element of a retaliation claim requires only "general corporate knowledge that the plaintiff has engaged in a protected activity." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000).

As to the third element, in the context of a retaliation claim, an adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see Vega*, 801 F.3d at 90. "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII," *Vega*, 801 F.3d at 90, in that it is "not limited to discrimination actions that affect the terms and conditions of employment," *id.* (quoting *Burlington N.*, 548 U.S. at 64). *See also Patane v. Clark*, 508 F.3d 106, 116 (2d Cir. 2007). It covers a narrow range of conduct in the sense that the alleged

retaliatory action must be "'materially adverse,' meaning that it causes 'significant' harm." *Muldrow*, 601 U.S. at 357 (quoting *Burlington N.*, 548 U.S. at 68).

Finally, Plaintiff must plead "but-for" causation such "that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013); *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360–61 (2013). This element can be "shown indirectly by timing: protected activity followed closely in time by adverse employment action." *Vega*, 801 F.3d at 90.

The standard for retaliation under the NYSHRL and NYCHRL is the same as under Title VII, except that NYSHRL and NYCHRL do not require an "adverse employment action" in order to state a claim for retaliation. *See Moore v. Hadestown Broadway Ltd. Liab. Co.*, 722 F. Supp. 3d 229, 247 (S.D.N.Y. 2024). Rather, under the NYSHRL and NYCHRL, the plaintiff need only plead that "something happened that was reasonably likely to deter a person from engaging in protected activity." *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 67 (S.D.N.Y. 2020). "[O]therwise, the burden on the other three prongs of a prima facie retaliation claim under the federal antidiscrimination law is identical to the NYSHRL and NYCHRL standards." *McSweeney v. Cohen*, 2025 WL 966022, at *26 n.16 (S.D.N.Y. Mar. 31, 2025) (citing *Moore*, 722 F. Supp. at 247).

Defendants argue that Plaintiff's report of the alleged assault and robbery does not constitute protected activity and that there is no causal connection between her report and ultimate termination. Dkt. No. 24 at 21–23. Defendants primarily argue that the alleged assault and robbery occurred outside of the context of the workplace and therefore Plaintiff's action in reporting the assault and robbery to 72andSunny did not constitute action taken "to protest or oppose statutorily prohibited discrimination." *Id.* at 21 (quoting *Mitchell v. New York City Dep't*

*of Educ.*, 2022 WL 621956 (S.D.N.Y. Mar. 3, 2022)). Defendants read Plaintiff's complaint too narrowly.

Plaintiff alleges that she reported the assault to Shutt and Venizelos, AC ¶ 96, that she reported to Venizelos that the Start-Up founders were harassing her by phone, *id.*, that she repeatedly told the two that 72andSunny's continued relationship with the Start-Up made her uncomfortable in the workplace, *id.* ¶¶ 96–98, and that, after she attended an event at which executives from the Start-Up were present, she made continued complaints that the presence of the Start-Up founders made her feel unsafe doing her job, *id.* ¶¶ 117–19, 126–28, and that on July 13, 2023, she stated to Shutt and Venizelos that she felt she was being discriminated against and was being retraumatized, *id.* ¶¶ 127–28. Plaintiff alleges that one month before her July 13, 2023 complaint, 72andSunny discussed Plaintiff building a new team to support 1800 Tequila and get the business back on track, *id.* ¶¶ 124, 131, but that the same day she made that complaint, her employment was terminated, *id.* ¶ 129.

Plaintiff's complaints about discrimination need not satisfy the *Twombly*/*Iqbal* standard for pleading a claim of hostile work environment for those complaints to constitute protected activity. *See Mitchell*, 745 F. Supp. 3d at 97 (a plaintiff need only allege that she had a "good faith, reasonable belief that the underlying challenged actions of [the defendant] violated the law"); *see Shepard v. Frontier Commc'ns Servs., Inc.*, 92 F. Supp. 2d 279, 291 (S.D.N.Y. 2000) (plaintiff's repeated complaints to supervisor about superior's conduct, even if conduct did not constitute sexual harassment, were protected activity because she had a reasonable, good faith belief that it did). Plaintiff's allegations support the claim that her complaints about how she was treated at 72andSunny following the assault could reasonably be understood to be about a hostile work environment. *See, e.g.*, *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1074–75 (10th Cir.

1998) (employer liable for hostile work environment by instructing plaintiff to continue waiting on customer that had harassed her and thereby placing her "in an abusive and potentially dangerous situation" despite authority to avoid doing so). Her complaint "would have allowed her employer to 'reasonably have understood that [Plaintiff's] opposition was directed at conduct prohibited by Title VII.'" *Kelly*, 716 F.3d at 17.

The other elements of her claim are well-pled. Plaintiff has alleged that she made her complaints to individuals at 72andSunny, including those in various leadership positions at 72andSunny, and has thus alleged that 72andSunny had knowledge of her protected activity. *See Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) (knowledge for retaliation requires only "general corporate knowledge that the plaintiff has engaged in a protected activity"); *Kwan*, 737 F.3d at 844 (knowledge of protected activity by an officer is "sufficient to impute to [the corporation] general corporate knowledge of the plaintiff's protected activity"). As to adverse action, 72andSunny does not dispute that her ultimate termination constitutes an adverse action, *see also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), *as amended* (June 6, 2001) (termination constitutes adverse action), but argues that, even if Plaintiff has adequately alleged protected activity, she has not alleged a causal link between her protected activity and termination. Dkt. No. 24 at 24.

"[C]ausation in the context of pleading a retaliation claim can be sufficiently established through temporal proximity." *Suarez v. N.Y. Cnty. District Att'y's Off.*, 2025 WL 894516, at *17 (S.D.N.Y. Mar. 24, 2025) (cleaned up). The fact that Plaintiff's employment was terminated immediately after her final complaint, particularly when before then she was praised for her performance, supplies the necessary inference of causation. *See Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 362–64 (S.D.N.Y. 2006) (filing of EEOC charges from June 2000 to December

2001 all "constitute protected activity" and were sufficiently close in time to instances of retaliation to state a *prima facie* case); *Wolf v. Time Warner, Inc.*, 2011 WL 856264, at *8 (S.D.N.Y. Mar. 3, 2011) (nine-week gap "well within the range courts in this circuit have found sufficient to create an inference of a causal connection").

Plaintiff has therefore stated a claim for retaliation under Title VII. Because her federal claim of retaliation survives, Plaintiff's NYSHRL and NYCHRL claims, which are judged under a more lenient standard, also survive. *See, e.g.*, *Jane v. Bhansali*, 2026 WL 636672, at *9 (E.D.N.Y. Mar. 6, 2026); *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 334 (S.D.N.Y. 2020). Defendants' motion to dismiss Plaintiff's claims of retaliation under federal and state law is therefore denied.

**CONCLUSION**

Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

Plaintiff's claims against Stagwell are dismissed with prejudice. Defendants' motion is denied with respect to Plaintiff's claims of discrimination on the basis of gender and retaliation under Title VII, NYSHRL, and NYCHRL. Plaintiff's claims of discrimination on the basis of race and claims of a hostile work environment under Title VII, NYSHRL, and NYCHRL are dismissed without prejudice to the filing of a motion for leave to file a second amended complaint.[12]

[12] "In the ordinary course, the Federal Rules of Civil Procedure provide that courts 'should freely give leave' to amend a complaint 'when justice so requires.'" *Williams v. Citigroup Inc.*, 659 F.3d 208, 212 (2d Cir. 2011) (per curiam) (quoting Fed. R. Civ. P. 15(a)(2)). "This permissive standard is consistent with [the] 'strong preference for resolving disputes on the merits,'" *id.* at 212–13 (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)). Plaintiff did not request leave to amend her complaint in her opposition to the motion to dismiss, "[b]ut even when a party does not ask for leave to amend, the Court may grant leave to amend *sua sponte*." *In re Garrett Motion Inc. Sec. Litig.*, 2022 WL 976269, at *18 (S.D.N.Y. Mar. 31, 2022) (internal quotation marks and citation omitted) (collecting cases); *see also Secure Source Claims Co.,*

The Clerk of Court is respectfully directed to close Dkt. No. 23.

SO ORDERED.

Dated: August 5, 2026
New York, New York

LEWIS J. LIMAN
United States District Judge

*LLC v. Miller*, 2024 WL 1342804, at *9 (S.D.N.Y. Mar. 29, 2024) (granting leave to replead absent request).